**Slip Op. 01-96**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

---

|  |  |  |
|---|---|---|
| THE TIMKEN COMPANY, | : | |
| Plaintiff, | : | |
| v. | : | Court No. 97-12-02156 |
| UNITED STATES, | : | |
| Defendant, | : | |
| PEER BEARING COMPANY,<br>L & S BEARING COMPANY, | : | |
| Defendant-Intervenors. | : | |

---

Plaintiff, The Timken Company ("Timken"), moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Final Results of Antidumping Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China</u>, 62 Fed. Reg. 61,276 (Nov. 17, 1997).

Timken claims that Commerce erred in: (1) selecting Indonesian, rather than Indian, import statistics for valuing the steel inputs and scrap for hot-rolled alloy steel bars used by Chinese producers to manufacture cups and cones, cold-rolled steel rods used in the production of rollers, cold-rolled sheet used in the production of cages and steel scrap; (2) failing to adjust overhead, selling, general and administrative expenses ("SG&A") and profit rates to account for differences in material and labor values of other surrogate sources used in determining foreign market value ("FMV"); (3) assuming that Indian direct labor costs data is equivalent to indirect labor costs data for the calculation of direct labor factor of production ("FOP")used to determine FMV; (4) refusing to use certain Chinese suppliers sales as export price sales; (5) failing to adjust United States price for marine insurance costs based on value rather than weight; and (6) committing a clerical error in the calculation of the weight of the scrap from one of the Chinese producers.

**Held:** Timken's motion for judgment on the agency record is granted in part and denied in part. Case is remanded to Commerce to: (1) determine direct labor costs without relying on labor hours and to open the record, if necessary; (2) exclude the "purchases of traded goods" from its calculation of COM; (3) adjust United States price by recalculating marine insurance pursuant to a value-based methodology; and (4) correct clerical errors in the calculation of the weight of scrap from one of the Chinese producers. Commerce's final determination is affirmed in all other respects.

[Timken's motion is granted in part and denied in part. Case remanded.]

Dated: August 9, 2001

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr. and Amy S. Dwyer) for plaintiff.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michele D. Lynch); of counsel: Rina Goldenberg, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Arent Fox Kintner Plotkin & Kahn, PLLC (John M. Gurley and Jinhee K. Wilde) for Peer Bearing Company, defendant-intervenor.

Cohen Darnell & Cohen, P.L.L.C. (Mark A. Cohen) for L & S Bearing Company, defendant-intervenor.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiff, The Timken Company ("Timken"), moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of Antidumping Administrative

Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China, 62 Fed. Reg. 61,276 (Nov. 17, 1997).

Timken claims that Commerce erred in: (1) selecting Indonesian, rather than Indian, import statistics for valuing the steel inputs and scrap for hot-rolled alloy steel bars used by Chinese producers to manufacture cups and cones, cold-rolled steel rods used in the production of rollers, cold-rolled sheet used in the production of cages and steel scrap; (2) failing to adjust overhead, selling, general and administrative expenses ("SG&A") and profit rates to account for differences in material and labor values of other surrogate sources used in determining foreign market value ("FMV"); (3) assuming that Indian direct labor costs data is equivalent to indirect labor costs data for the calculation of direct labor factor of production ("FOP"); (4) refusing to use certain Chinese suppliers' sales as export price sales; (5) failing to adjust United States price for marine insurance costs based on value rather than weight; and (6) committing a clerical error in the calculation of the weight of the scrap from one of the Chinese producers.

## BACKGROUND

The administrative review at issue concerns steel inputs and

scrap for hot-rolled alloy steel bars used by Chinese producers to manufacture cups and cones, cold-rolled steel rods used in the production of rollers, cold-rolled sheet used in the production of cages and steel scrap imported from the People's Republic of China ("PRC") during the period of review covering June 1, 1995 through May 31, 1996.[1]  Commerce published the preliminary results of the subject review on July 9, 1997.  See Preliminary Results of Antidumping Administrative Review and Partial Termination of Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Preliminary Results"), 62 Fed. Reg. 36,764.  On November 17, 1997, Commerce published the Final Results at issue.  See 62 Fed. Reg. 61,276.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in

---

[1]  Since the administrative review at issue was initiated after January 1, 1995, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994).  Compare Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## I. Substantial Evidence Test

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted). Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

## II.  <u>Chevron</u> Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u> ("<u>Chevron</u>"), 467 U.S. 837 (1984).  Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue."  <u>Id.</u> at 842.  "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'"  <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing <u>Chevron</u>, 467 U.S. at 843 n.9).  "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning.  Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter."  <u>Id.</u> (citations omitted).  Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history."  <u>Id.</u> (citations omitted); <u>but see</u> <u>Floral Trade Council v. United States</u>, 23 CIT ___,___ n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States Dep't of Commerce, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. See Mitsubishi Heavy Indus. v. United States, 22 CIT ___, ___, 15 F. Supp. 2d 807, 813 (1998).

### III. Mead-Christensen-Skidmore Test

"[A]dministrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." <u>United States v. Mead Corp.</u>, 121 S. Ct. 2164, 2171 (2001). "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." <u>Id.</u> If the

> agency's generally conferred authority and other statutory circumstances [imply] that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not actually have an intent" as to a particular result[,] . . . a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise . . . .

<u>Id.</u> at 2172 (citing <u>Chevron</u>, 467 U.S. at 845-46).

"It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." <u>Id.</u> (citations omitted). The want of notice-and-

comment rulemaking or formal adjudication, however, "does not alone
. . . bar the application of Chevron." Id. at 2173. Courts "have
sometimes found reasons for Chevron deference even when no such
administrative formality was required and none was afforded."[2] Id.
(citations omitted).

Absent congressional intent to delegate general authority to
make rules with the force of law, agency "rulings are treated . .
. like 'interpretations contained in policy statements, agency
manuals, and enforcement guidelines'" that do not warrant the
Chevron deference. Id. at 2175 (quoting Christensen, 529 U.S. at
587). A reference to such agency statements neither creates
precedential value nor does it create Chevron entitlement; while
such statements may sometimes function as precedents, "they enjoy
no Chevron status as a class." Id. at 2174.

Even placed outside of the Chevron realm, "an agency's

---

[2] Similarly, "an agency's interpretation of its own
regulation[s] is entitled to deference" when the language of the
regulation is ambiguous or the regulation is silent about the issue
at hand. Christensen v. Harris County, 529 U.S. 576, 588 (2000)
(citing Auer v. Robbins, 519 U.S. 452, 461 (1997)); Southern Cal.
Edison Co. v. United States, 226 F.3d 1349, 1356 (Fed. Cir. 2000)
(detailing the test and quoting Martin v. Occupational Safety and
Health Review Comm'n, 499 U.S. 144, 151 (1991)). When the
regulation is not ambiguous, however, to defer to a different
agency's position would be to permit the agency, under the guise of
interpreting a regulation, to create de facto a new regulation.
See id.

interpretation [of a statutory provision] may merit some deference
. . . given the 'specialized experience and broader investigations
and information' available to the agency . . . and given the value
of uniformity in its administrative and judicial understandings of
what a national law requires."  Id. at 2175 (quoting Skidmore v.
Swift & Co., 323 U.S. 134, 139-40 (1944)).  "Where the regulatory
scheme is highly detailed, and [an agency] can bring the benefit of
specialized experience to bear on the subtle questions," such
interpretations are entitled to respect "proportional to [their]
'power to persuade'".  Id. at 2175-76 (quoting Skidmore, 323 U.S.
at 140).  "The fair measure of [judicial] deference to an agency
administering its own statute has been understood to vary with
circumstances, and courts have looked  to the degree of the
agency's care, its consistency, formality, and relative expertness,
and to the persuasiveness of the agency's position."  Id. at 2171
(citing Skidmore, 323 U.S. at 139-40).  Well-reasoned views of the
agencies implementing a statute "'constitute a body of experience
and informed judgment to which courts and litigants may properly
resort for guidance . . . .'"  Id. (quoting Bragdon v. Abbott, 524
U.S.   624,   642   (1998)   (internal   quotation   omitted)).
"'[C]onsiderable  weight  should  be  accorded  to  an  [agency's]
construction of a statutory scheme it is entrusted to administer .
. . .'"   Id. (quoting Chevron, 467 U.S. at 844).  "'The weight

[accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" Id. at 2172 (quoting Skidmore, 323 U.S. at 140, brackets in original).


**DISCUSSION**

**A.    Commerce's Selection of Indonesian Import Statistics as a Surrogate Value for Raw-Material Costs of Steel Used by Chinese Producers**

**1.    Background**

Antidumping margins are the difference between normal value ("NV") and United States price of the merchandise.  When the merchandise is produced in a nonmarket economy country ("NME"), such as the PRC, Commerce constructs NV pursuant to section 1677b(c), which provides that

> the valuation of the factors of production shall be based on <u>the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]</u>.

19 U.S.C. § 1677b(c)(1) (1994) (emphasis supplied).

The statute does not define the phrase "best available information," it only provides that

> [Commerce], in valuing factors of production[,] . . . shall utilize, to the extent possible, the prices or costs of factors of production in <u>one or more market economy countries</u> that are[:] (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4) (1994) (emphasis supplied).

Thus, the statute grants to Commerce broad discretion to determine the "best available information" in a reasonable manner on a case-by-case basis. See <u>Lasko Metal Prods., Inc. v. United States</u>, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (noting that the statute "simply does not say--anywhere--that the factors of production must be ascertained in a single fashion.") Consequently, Commerce values as many FOPs as possible using information obtained from the "primary" surrogate country, that is, the country that Commerce considers to be most comparable in economic terms to the NME country being investigated, and that also produces merchandise comparable to the subject merchandise. <u>See, e.g.</u>, <u>Tianjin Mach. Import & Export Corp. v. United States</u> ("<u>Tianjin</u>"), 16 CIT 931, 940-41, 806 F. Supp. 1008, 1018 (1992); <u>Timken Co. v. United States</u>, 16 CIT 142, 145-46, 788 F. Supp. 1216, 1218 (1992). Additionally, if Commerce determines that suitable

values cannot be obtained from the data of the primary surrogate country, Commerce resorts to the data from the second, and sometimes the third, surrogate. See, e.g., Final Results of Antidumping Duty Administrative Review and Revocation in Part of Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China, 62 Fed. Reg. 6189, 6193 (Feb. 11, 1997); Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China, 61 Fed. Reg. 65,527, 65,532-33 (Dec. 13, 1996); Notice of Final Determination of Sales at Less Than Fair Value: Certain Partial-Extension Steel Drawer Slides with Rollers From the People's Republic of China, 60 Fed. Reg. 54,472, 54,476 (Oct. 24, 1995); Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China, 59 Fed. Reg. 55,625, 55,629 (Nov. 8, 1994); Final Determination of Sales at Less Than Fair Value: Certain Helical Spring Lock Washers From the People's Republic of China, 58 Fed. Reg. 48,833, 48,835 (Sept. 20, 1993).

During this review, Commerce chose India as the primary surrogate country to value all FOPs except steel inputs and scrap, which were valued using the data from the secondary surrogate

country, Indonesia. See Preliminary Results, 62 Fed. Reg. at 36,769. Commerce explained that it decided to use secondary surrogate data for two reasons: (1) Commerce determined that steel values contained in the Indian import data were not reliable, see Def.'s Mem. Opp. Pl.'s Mot. J. Agency R. ("Def.'s Mem."), Ex. 4; and (2) Commerce was unable to isolate Indian import value for bearing-quality steel used to manufacture the merchandise at issue. See Final Results, 62 Fed. Reg. at 61,283.

Commerce reached the determination that steel values contained in Indian import data were not reliable after comparing Indian statistics with other information on the record, the information specifically isolating bearing-quality steel used to manufacture the intended merchandise, that is, United States import data under tariff categories 7228.30.20.00, 7228.50.10.10, and 7209.42.00.00. See Def.'s Mem., Ex. 4. Because the comparison revealed that the average values of steel included in the corresponding Indian import categories were significantly higher than the average values of bearing-quality steel imported into the United States, Commerce concluded that steel values contained in the Indian import data were not reliable. See id.

Commerce concluded that it was unable to isolate Indian import value for bearing-quality steel used to manufacture cups and cones because Commerce believed that while bearing-quality steel used to manufacture cups and cones was most likely to be contained in Indian broader category 7228.30, Commerce found no eight-digit Indian sub-category specific to this particular type of steel. See id. Commerce also determined that data from a more specific Indian category, that is, sub-category 7228.30.19, was similarly unreliable because the steel in the sub-category was valued too highly to be considered a reliable indicator of the price of bearing-quality steel. See id. Additionally, Commerce concluded that it had no information concerning what sub-category 7228.30.19 contained and that none of the parties in the proceeding suggested that the sub-category specifically isolated bearing-quality steel. See id.

After reaching these conclusions, Commerce decided to use some import data from a secondary surrogate country. See Final Results, 62 Fed. Reg. at 61,283. Of the five potential surrogate countries that Commerce identified as being at a comparable level of economic development to the PRC, Commerce found that only India and Indonesia exported bearings during the pertinent period of time. See Def.'s Mem., Ex. 4. Commerce conducted further research and

identified two Indonesian bearings producers operating in 1995.

See id.  Consequently, Commerce concluded that Indonesia was a

significant producer of merchandise comparable to that at issue for

purposes of the surrogate country selection.  See id.  Commerce

also noted that when compared to United States bearing-quality

steel import data, Indonesian values closely approximated those of

the United States.  See id.  In light of the above findings,

Commerce decided to

> use[] import data from another surrogate country,
> Indonesia, a producer of merchandise comparable to [that
> at issue], to value steel used to produce these
> components. As with the Indian data, [Commerce was]
> unable to isolate the value of bearing-quality steel or
> identify an eight-digit category containing such steel
> imported into Indonesia; however, unlike the Indian data,
> the Indonesian six-digit category is consistent with the
> value of [United States] imports of bearing-quality steel
> under the comparable six-digit category in the United
> States, which specifically includes bearing-quality
> steel.

Final Results, 62 Fed. Reg. at 61,283.

###    2.    Contentions of the Parties

Commerce maintains that its determination and the underlying

analyses were reasonable and in accord with the mandate of 19

U.S.C. § 1677b(c) and the level of discretion afforded to Commerce

by Chevron, 467 U.S. 837.  Specifically, Commerce points out that:

(1) Commerce properly relied on FOPs from two different surrogate sources; (2) Commerce reasonably concluded that Indonesia could serve as a surrogate country for the purposes of import valuation of the merchandise at issue; (3) Commerce's decision to reject Indian import values was supported by substantial evidence, see Def.'s Mem. at 14-21; (4) Commerce's comparison of Indian import values to those of United States was not a sole factor for Commerce's determination, see id. at 17 n.4; and (5) Commerce properly conducted the comparison in view of the interpretation of 19 U.S.C. § 1677b(c) offered by Peer Bearing Co. v. United States, 22 CIT 472, 12 F. Supp. 2d  445 (1998).  See Def.'s Mem. at 18.

Timken reads Commerce's determination as a statement that Commerce relied on Indonesian data solely because Commerce asserted that: "(1) Indonesian steel import values approximated [United States] values[;] (2) Indonesian and [United States] values were below Indian values[; and, (3) in view of the foregoing,] it was reasonable to conclude that Indian values were unreliable."  Pl.'s Reply Br. at 2.  Timken consequently maintains that Commerce's determination based on the argument was arbitrary because nowhere did Commerce "establish a basis for concluding that United States import prices for any category of steel should be considered a benchmark against which to measure the reliability of Indian

statistics."   Id. at 2 (emphasis omitted), see also id. at 5. Moreover, Timken asserts that the fact that Indian import values were on average higher that United States or Indonesian import values established nothing of relevance to the review at issue. Id. at 3-7.

Next, Timken claims that Commerce's resort to Indonesian data was not warranted because the record shows "the lack of evidence demonstrating that Indonesia was a significant producer of bearings during the period of review."  Mem. P.& A. Supp. Pl.'s Mot. J. Agency R. ("Pl.s Mem.") at 35 n.9.

Additionally, Timken points out that Commerce violated its own "strong preference to calculate [] normal value in NME cases based on factor values from a single surrogate source."  Id. at 32-35 (emphasis in original, citing to Peer Bearing, 22 CIT 472, 12 F. Supp. 2d  445; Tianjin, 16 CIT at 940, 806 F. Supp. at 1017-18; Final Results of Antidumping Duty Administrative Review of Industrial Nitrocellulose from the People's Republic of China, 62 Fed. Reg. 65,667, 66,668 (Dec. 15, 1997); Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From Ukraine, 62 Fed. Reg. 61,754, 61,762 (Nov. 19, 1997); and ANTIDUMPING MANUAL 65-66 (Dept. Of Commerce, July

1994)).  Timken further asserts that the holding of <u>Peer Bearing</u>, 22 CIT 472, 12 F. Supp. 2d  445, cannot serve as a precedent for the determination at issue because: (1) the factual record before the Court in <u>Peer Bearing</u> did not include the evidence analogous to that on the record at the review at issue; and (2) the holding of <u>Peer Bearing</u> does not support Commerce's decision to reject Indian import values as unreliable.  <u>See</u> Pl.'s Reply Br. at 7-10.

Peer  Bearing  Company  ("Peer  Bearing"),  the  defendant-intervenor  in  this  action,[3]  supports  Commerce's  position  and alleges that Commerce's determination was reasonable because: (1) Commerce  specifically  found  that  Indonesia  was  a  significant producer of the merchandise at issue; and (2) Commerce's resort to the data from a secondary surrogate was in accordance with law. <u>See</u> Resp. Def.-Intervenor Pl.'s Mot. J. Agency R. ("Peer Bearing's Resp.") at 3, 5, 6-9.  Peer Bearing asserts that Timken overstated the strength of Indian data and downplayed the extent to which the Indian data was unreliable.  <u>See id.</u> at 6-9.  In addition, Peer Bearing maintains that <u>Peer Bearing</u>, 22 CIT 472, 12 F. Supp. 2d 445, is a controlling precedent for the determination at issue.

---

[3] L & S Bearing Company has intervened in this action but did not  file  a  motion  for  judgment  upon  the  agency  record  and supporting brief.

3.    Analysis

a.    Court Deference

i.    Chronologically Consecutive
      Pronunciations by Commerce

Between    two    incompatible    agency    statements,    as    with
conflicting statutory authorities, the later one is controlling
over the earlier one.  Cf. FDA v. Brown & Williamson Tobacco Corp.,
529 U.S. 120, 143 (2000).  This rule of construction was a part of
our legal system from the time immemorial.

> If two inconsistent acts be passed at different times,
> the last . . . is to be obeyed, and if obedience cannot
> be observed without derogating from the first, it is the
> first which must give way.  Every act of [government]
> must be considered with reference to the state of the law
> subsisting when it came into operation, and when it is to
> be applied; it cannot otherwise be rationally construed.
> Every act is made, either for the purpose of making a
> change in the law, or for the purpose of better declaring
> the law, and its operation is not to be impeded by the
> mere fact that it is inconsistent with some previous
> enactment.

Becker Prods. Co. v. State Tax Comm'n, 58 P.2d 36, 38-39 (Utah
1936) (quoting POTTER'S DWARRIS ON STATUTES AND CONSTITUTIONS 155).

The same mode is applicable to agency pronunciations and the
ensuing court reviews under the test posed by Chevron.  Because the
Court  is  obligated  to  sustain  an  agency  interpretation  and
implementation of a statutory mandate if such agency action is

reasonable and supported by substantial evidence, see IPSCO, 965 F.2d at 1061; Koyo Seiko, 36 F.3d at 1570; Negev Phosphates, 12 CIT at 1077, 699 F. Supp. at 942, it follows that this level of deference is due to each action by the agency and irrelevant to whether the Court upheld a prior conflicting agency action under the very same test.  See generally, Chevron, 467 U.S. at 844-45. Consequently, between two reasonable yet conflicting agency determinations, each taken with compatible levels of formality, the later one controls and the Court is obligated to sustain it. Accord Mead, 121 S. Ct. at 2173.

It makes no difference if the prior pronunciation by the agency was reduced to a manual, a form of agency action afforded no judicial deference and serving as no precedent.  See id., 121 U.S. at 2174, Skidmore, 323 U.S. at 139-40.  The mere fact that an agency pronunciation was reduced to some written form, that is, a form which is afforded no court deference under Skidmore, 323 U.S. at 139-40, can neither disturb nor outweigh the deference owed by the Court to a subsequent reasonable agency pronunciation under Chevron test, even if the subsequent pronunciation conflicts with the previous one.  The foregoing, however, does not mean that the Court should not examine the validity of the policy causing the change or the soundness of the newly-employed methodology.

###           ii.  Commerce's Changes of Policy or Methodology

Agency statements provide guidance to regulated industries. While "'an agency does not act rationally when it chooses and implements one policy and decides to consider the merits of a potentially inconsistent policy in the very near future,'" Transcom, Inc. v. United States, 24 CIT ___, ___, 123 F. Supp. 2d 1372, 1381 (2000) (quoting ITT World Communications, Inc. v. FCC, 725 F.2d 732, 754 (D.C. Cir. 1984)), Commerce, in view of the rapidly-changing world of global trade and Commerce's limited resources, should be able to rely on its "unique expertise and policy-making prerogatives." Southern Cal. Edison, 226 F.3d at 1357. "'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy . . . .'" See Chevron 467 U.S. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

An agency decision involving the meaning or reach of a statute that reconciles conflicting policies "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [and a reviewing court] should not disturb [the agency decision] unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" Id. at 845 (quoting United States

v. Shimer, 367 U.S. 374, 382-83 (1961)).  Furthermore, an agency must be allowed to assess the wisdom of its policy on a continuing basis.  Under the Chevron regime, agency discretion to reconsider policies is inalienable.  See id. at 843.  Any assumption that Congress intended to freeze an administrative interpretation of a statute would be entirely contrary to the concept of Chevron which assumes and approves of the ability of administrative agencies to change their interpretations.  See, e.g., Maier, P.E. v. United States EPA, 114 F.3d 1032, 1043 (10th Cir. 1997), J.L. v. Social Sec. Admin., 971 F.2d 260, 265 (9th Cir. 1992), Saco Defense Sys. Div., Maremont Corp. v. Weinberger, 606 F. Supp. 446, 450-51 (D. Me. 1985).  In sum, underlying agency interpretative policies "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron 467 U.S. at 844.

Moreover, "'[a]n [agency] announcement stating a change in the method . . . is not a general statement of policy.'" American Trucking Ass'ns, Inc. v. ICC, 659 F.2d 452, 464 n.49 (5th Cir. 1981) (quoting Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979) (internal quotations omitted)).  While a policy "denotes . . . [the] general purpose [of the statute] considered as directed to the welfare or prosperity of the state," BLACK'S LAW DICTIONARY 1157 (6th ed. 1990), methodology refers only to the

"performing [of] several operations[] in the most convenient order," id. at 991; accord Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir. 1983); Interstate Natural Gas Ass'n of Am. v. Federal Energy Regulatory Comm'n, 716 F.2d 1 (D.C. Cir. 1983); Hooker Chems. & Plastics Co. v. Train, 537 F.2d 620 (2d Cir. 1976). Consequently, courts are even less in the position to question an agency action if the action at issue is a choice of methodology, rather than policy. See, e.g., Maier, 114 F.3d at 1043 (citing Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1221 (D.C. Cir. 1983)). Similarly, an agency decision to change its methodology, that is, to take the act of statutory implementation while pursuing the same policy, should be examined under the Chevron test and sustained if the new methodology is reasonable. See, e.g., Koyo Seiko Co v. United States, 24 CIT ___, ___, 110 F. Supp. 2d 934, 942 (2000) (stating that "'the use of different methods [of] calculati[on] . . . does not [mean there is a] conflict with the statute,'" quoting Torrington Co. v. United States, 44 F.3d 1572, 1578 (Fed. Cir. 1995)).

**b.   Commerce's Determination at Bar**

The statute permits Commerce to draw surrogate value

information from more than one market economy country. See 19 U.S.C. § 1677b(c)(1) (stating that Commerce may derive FOPs from "countries considered to be appropriate," emphasis supplied). While Timken stresses the reference in 19 C.F.R. § 353.52(c) (1997) to "a" market economy country, see Def.'s Mem. at 33, the mere use of the singular article cannot mean that all factors be valued on the basis of the data from a single surrogate country.[4]  See Chemical Prods. Corp. v. United States, 10 CIT 700, 706, 650 F. Supp. 178, 182 (1986) ("The regulation is silent concerning whether Commerce may use data from a country other than its designated surrogate when Commerce finds that a comparison of one element of foreign market value in the surrogate would yield an unrealistic result.")

Commerce's Antidumping Manual, which Timken cites in support of its assertion that there is a strong preference for using a single surrogate country, in fact implies that Commerce could utilize data from more than one surrogate country where it is necessary to obtain reliable information. Specifically, Commerce's Antidumping Manual provides that to the extent it is possible, Commerce should endeavor to rely on the information from: (1) the

---

[4] See supra note 2 and accompanying text for discussion of the level of deference given to an agency's interpretation of its own regulation.

first choice surrogate country; or (2) a single surrogate country.

See Peer Bearing's Resp. at 7.  This language parallels that of the

statute which provides that Commerce "shall utilize, <u>to the extent</u>

<u>possible</u>, the prices or costs of factors of production in one or

<u>more market economy countries</u> . . . ."  19 U.S.C. § 1677(c)(4)

(emphasis supplied).


Because the statute and the manual both suggest that Commerce

should rely on data from the "first choice surrogate country" only

to the extent possible, it is logical to conclude that, where it is

not possible, Commerce is entitled to rely on data from other

surrogate countries.  The manual further explains that:

> [<u>I</u>]<u>f there is [however,] no reliable information from the</u>
> <u>first choice surrogate country for particular factor,</u>
> <u>[Commerce] will attempt to use [reliable information]</u>
> <u>from the second choice surrogate country</u>, and so on. In
> this way, [Commerce] will maintain the dual hierarchy of
> valuing factors of production following the preferred
> order of surrogate countries as recommended by
> [Commerce's] Office of Policy . . . .

Peer Bearing's Resp. at 8 (quoting ANTIDUMPING MANUAL 65, emphasis in

quotation); <u>accord</u> <u>Timken Co. v. United States</u>, 23 CIT ___, ___, 59

F. Supp. 2d 1371, 1376 (1999) (stating that "'[t]he statute does

not require Commerce to follow any single approach in evaluating

data'" and quoting <u>Olympia Indus., Inc. v. United States</u>, 21 CIT

364, 368 (1997) (quoting, in turn, <u>Lasko Metal Prods.</u>, 43 F.3d at

1446)).

Commerce's decision to incorporate Indonesian data did not conflict with Commerce's methodology as announced in Commerce's manual.  Moreover, the change of the mode from the use of a single surrogate datum to the use of multiple surrogate data cannot be found unreasonable simply on the basis that the prior methodology, advocating the preference for a single surrogate datum, was reduced to writing in Commerce's manual.  See Chevron, 467 U.S. at 844; compare Skidmore, 323 U.S. at 140.  Considering that the goal of Commerce's policy has not changed, see Air Prods. and Chems., Inc. v. United States, 22 CIT 433, 435, 14 F. Supp. 2d 737, 741 (1998) (stating that the goal of Commerce's FOPs methodologies should be "to construct the product's price . . . using the best information available regarding surrogate values," emphasis suppled, citation omitted); Olympia Indus., Inc. v. United States, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1000 (1998) (pointing out that "accuracy is the touchstone of the antidumping statute" and citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)), the remaining issue is only whether Commerce's current methodology is reasonable.  See Chevron, 467 U.S. at 844-45; Koyo Seiko, 36 F.3d at 1570.

Because there is "[n]othing in the antidumping statute or its

legislative history mandat[ing] that Commerce must derive [the information] from surrogate-based values according to a certain methodology," Timken, 23 CIT at ___, 59 F. Supp. 2d at 1376 (citation omitted), and in view of Commerce's discretion to draw surrogate value information from more than one market economy country, see 19 U.S.C. § 1677b(c)(1), it was "within Commerce's authority to use India as a primary surrogate in conjunction with Indonesian values . . . ." Timken, 23 CIT at ___, 59 F. Supp. 2d at 1367.

With respect to Timken's challenge to Commerce's decision to use Indonesian values, the Court finds that Timken is assailing not Commerce's methodology but rather the result reached by Commerce, which is outside the Court's standard of review. See Writing Instrument Mfrs. Ass'n, Pencil Section v. United States, 21 CIT 1185, 1195, 984 F. Supp. 629, 639 (1997). Commerce conducted research and identified two substantial Indonesian bearings producers operating in 1995, on the basis of which Commerce concluded that Indonesia was a significant producer of merchandise comparable to that at issue for purposes of the surrogate country selection. See Def.'s Mem., Ex. 4. The Court is not in the position to declare such a conclusion unreasonable. See Chevron, 467 U.S. at 845.

Next, the Court rejects Timken's assertion that Commerce erred in using United States data as benchmarks to test the reliability of the Indian import data for valuing the merchandise at issue. The Court has found in prior cases that comparing surrogate data to that of market economy to determine the reliability of such surrogate data is within "'Commerce's statutory authority and consistent with past practice.'" Peer Bearing, 22 CIT at 481, 12 F. Supp. 2d at 455 (quoting Writing Instrument Mfrs. Ass'n, 21 CIT at 1195, 984 F. Supp. at 639 (upholding use of United States benchmark as a point of comparison for two possible surrogate values and quoting, in turn, Olympia Indus., Inc., 21 CIT at 369 (approving Commerce's use of data from other market economies to test the reliability of surrogate country data))). Commerce, therefore, acted within its statutory authority by utilizing United States data to aid in its FOPs valuation. See id. (citing 19 U.S.C. § 1677b(c)(1), (4)).

Finally, Commerce could reasonably find Indian data unreliable because Commerce has never adopted a numerical standard for identifying aberrational or questionable data and has properly exercised its statutory discretion by determining what information to use for valuing FOPs on a case-by-case basis. Moreover, Commerce has in other cases rejected as unsuitable surrogate data

which varied from a benchmark to a much lesser extent than in this particular case.  See, e.g., Final Determination of Sales at Less Than Fair Value: Circular Welded Non-Alloy Steel Pipe From Romania, 57 Fed. Reg. 42,957, 42,958 (Sept. 17, 1992).


**B.    Commerce's Reliance on SKF India's Data in
       Commerce's Determination of General Expenses and Profit**

### 1.    Background

While Commerce prefers to base FOPs information on industry-wide public information, Commerce found that information regarding overhead and SG&A rates for producers of subject merchandise during the period of review was not available.  See Final Results, 62 Fed. Reg. at 61,287.


Section 1677b(c)(1) of Title 19 requires Commerce to "determine [NV] of the subject merchandise on the basis of the value of the [FOPs] utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1).  General expenses are the expenses that do not bear a direct relationship to the production of the merchandise at issue, such as SG&A expenses.  The subsection also states that the valuation of FOPs "shall be based on the best available information

regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]."  Id. Section 1677b(c)(4) of Title 19 provides that, in valuing FOPs under paragraph (1) of section 1677b(c), Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries . . . ."  19 U.S.C. § 1677b(c)(4) (1).

Commerce has interpreted the "best available information" and "the extent possible" language contained in 19 U.S.C. §§ 1677b(c)(1) and (4) as applicable to the calculation of the amount for general expenses and profit that is to be added to the FOPs referenced in paragraph (1) of section 1677b(c).  See Def.'s Mem. at 22 (pointing out that Congress did not specify the exact methodology of how the amount for the general expenses and profit are to be calculated in the case of an NME country and citing Springfield Indus. Corp. v. United States, 842 F.2d 1284, 1285 (Fed. Cir. 1988) (citing, in turn, Chevron, 467 U.S. at 843-44, 865-66)).

Applying this interpretation during the review at issue, Commerce concluded that an appropriate surrogate for determining general expenses and profit was SKF India, an Indian producer of merchandise similar to the imported merchandise at issue.

Consequently, Commerce determined overhead, SG&A, and profit rates from the information contained in SKF India's financial report. See Def.'s Mem., Ex. 3; Final Results, 62 Fed. Reg. at 61,287. Specifically, Commerce calculated the ratio of SKF India's overhead costs to its cost of manufacturing ("COM"), that is, the cost of materials plus labor, and explained that

> [i]n deriving these rates, [Commerce] used the SKF data both with respect to the numerators (total overhead and SG&A expenses, respectively) and denominator (total cost of manufacturing). This methodology allowed [Commerce] to derive internally consistent ratios of SKF India's overhead and SG&A expenses. These ratios, when multiplied by the factors of production [Commerce] used in [Commerce's] analysis, constitute[d] the best available information concerning the overhead and SG&A expenses that would be incurred by a PRC bearings producer given such factors of production.

Final Results, 62 Fed. Reg. at 61,287.

Commerce applied these ratios to the surrogate values consisting of Indonesian and Indian import data. See Peer Bearing's Resp. at 4.

### 2. Contentions of the Parties

Timken argues that, since SKF India's operation involves the purchasing from subcontractors, SKF India's cost of materials is higher and overhead costs are lower than those of a producer that

itself manufactures the merchandise.  See Pl.'s Mem. at 43-45.
Because the PRC producers subject to the review manufacture the
merchandise themselves, Timken concluded that their materials and
overhead costs are not similar to those of SKF India.  See id.
Timken maintains that since Commerce did not use SKF India's report
to value all FOPs, it should adjust overhead and SG&A rates to
reflect the use of lower-value materials and higher overhead costs
of the Chinese producers.  See id.  Timken asserts that the
inclusion of SKF India's full materials and labor costs in the COM
denominator creates a distortive result unless this data is also
the basis for valuing the materials and direct labor factors in the
constructed value calculation.  See id.; Final Results, 62 Fed.
Reg. at 61,287.


     Commerce maintains that the methodology used allowed Commerce
to derive internally consistent ratios of SKF India's overhead and
SG&A expenses.  See Final Results, 62 Fed. Reg. at 61,287.
Commerce contends that doing otherwise, that is, adjusting the
underlying values of SKF India, would create a result no longer
representative of SKF India's costs.  See id.  Specifically,
Commerce pointed out that

> Timken's recommended adjustment would reduce the
> denominator but would leave the overhead and SG&A
> expenses in the numerator unchanged. As such, [Commerce]
> find[s] that this adjustment would itself distort the

resulting ratio, rather than cure the alleged distortion
in [Commerce's] calculations.

Id.


Peer Bearing supports Commerce's conclusion and states that
"Timken's assertion that the application of the
overhead/SG&A/profit ratios (derived from SKF India) to the
material and labor costs (derived from other sources) 'mixes apples
and oranges' and is incorrect.'" Peer Bearing's Resp. at 13. Peer
Bearing maintains that Commerce's application of ratios for
overhead, SG&A and profit derived from one source to COM values
derived from another one is consistent with Commerce's practice in
other NME cases, see id. at 12 (citing Final Results and Rescission
in Part of Antidumping Duty Administrative Review of Tapered Roller
Bearings and Parts Thereof, Finished or Unfinished, From the
Republic of Romania, 61 Fed. Reg. 51,427, 51,429 (Oct. 2, 1996);
Preliminary Determination of Sales at Less Than Fair Value:
Coumarin From the People's Republic of China, 59 Fed. Reg. 39,727,
39,729 (August 4, 1994), and points out that the adjustment
suggested by Timken was never performed by Commerce.

### 3.    Analysis

"In the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable." Timken, 23 CIT at ___, 59 F. Supp. 2d at 1377; see also Chevron, 467 U.S. at 844-45.  Specifically, Commerce's authority to select appropriate surrogate data includes the authority to base a calculation on these data without adjustment, if such method is reasonable.  See id.; see also Peer Bearing, 22 CIT at 481-82, 12 F. Supp. 2d at 456.

While Timken states that it finds Commerce's mode of calculation imperfect, see Pl.'s Mem. at 44, Timken provides this Court with neither an explanation of why this mode is unreasonable nor offers a viable methodology for: (1) detecting the difference between Chinese and SKF India's overhead and material costs; or (2) adjusting SKF India's overhead and SG&A ratios.  See id. at 43-45. Indeed, it is not enough to state that "the agency[] [is operating under] statutory mandate to 'reach the most accurate result,'" in order to label an agency determination unreasonable.  Id. at 45, compare Olympia Indus., 22 CIT at 390, 7 F. Supp. 2d at 1001 (finding Commerce's determination unreasonable where "Commerce[,] [under] an obligation to review all data and then determine what constitutes the best information available or, alternatively, to

explain why a particular data set is not methodologically reliable," failed to do so).

"Commerce attempted to capture in its rate calculation the surrogate company's experience in incurring overhead and SG&A expenses," Def.'s Mem. at 24, and created a reasonable internally consistent ratio that does not violate the boundaries set by 19 U.S.C. § 1677b(c) (1994). The fact that one of the actual parameters is likely to be higher while the other one is likely to be lower than the corresponding data derived from the records of SKF India means that neither Commerce's methodology shall be deprived of this Court's deference, nor does it constitute sufficient grounds for the Court to uphold Timken's suggestion as a more palatable alternative. See American Spring Wire, 8 CIT at 22, 590 F. Supp. at 1276 (stating that "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo'" and quoting Penntech Papers, 706 F.2d at 22-23 (quoting, in turn, Universal Camera, 340 U.S. at 488)).

C.   **Commerce's Use of Direct and Indirect Labor Rates**

   1.   **Commerce's Refusal to Isolate Direct Labor Component of SKF India's Costs in Commerce's Calculation of SKF India's Overhead, SG&A and Profit.**

      **a. Background**

In order to calculate overhead, SG&A and profit ratios based on SKF India's data, Commerce relied on SKF's COM designated in SKF India's 1995-96 financial statement based on both direct and indirect labor expenses.  See Final Results, 62 Fed. Reg. at 61,288.  Commerce proceeded with the calculation of overhead that incorporated both direct and indirect labor costs.  Commerce explained that Commerce

> calculate[d] an overhead-to-COM ratio by dividing SKF's total overhead expense by the sum of SKF's total materials, direct labor, indirect labor, and overhead expenses from its annual report. [Commerce] calculate[d] the COM component of constructed value for subject merchandise by summing direct material expense, direct labor expense, indirect labor expense, and overhead expense.  However, while [Commerce knew] the direct material expense, direct labor expense, and indirect labor expense of the subject merchandise, [Commerce did] not know the overhead expense of the subject merchandise. Therefore, in order to calculate the COM component of constructed value for subject merchandise, [Commerce had to] substitute a surrogate for overhead expense. [Commerce] calculate[d] this surrogate overhead expense by multiplying COM by the overhead-to-COM ratio [Commerce] calculated using SKF India's data.  This substitution le[ft] COM as the sole unknown factor. Therefore, [Commerce] solve[d] for COM using the direct material expense, direct labor expense, indirect labor expense, and the overhead-to-COM ratio.  Because both direct and indirect labor figures [we]re part of this

calculation, [Commerce did] not need to adjust for the
fact that both direct and indirect labor [we]re included
in SKF India's labor expense in [Commerce's] calculation
of the overhead-to-COM ratio.  Therefore, there [wa]s no
need to segregate the direct-labor component from SKF's
financial statements in order to calculate the percentage
because [Commerce did] not use only direct labor expense
in our calculations.

Id. (emphasis supplied).


### b.    Contentions of the Parties

Timken contends that Commerce should have isolated and used
SKF India's direct labor costs only in Commerce's calculation
because the inclusion of indirect labor costs in the denominator of
the formula resulted in an understatement of SKF India's rates.
See Pl.'s Mem. at 46-47.  Timken points out that Commerce failed to
collect any information enabling Commerce to determine direct labor
costs, see Pl.'s Reply at 18-19, effectively rewarding respondents
for failing to provide such data, see id. at 17-18, and abrogating
Commerce's "duty to calculate dumping margins as accurately as
possible."  Pl.'s Mem. at 47 (citing Olympia Indus. 22 CIT at 390,
7 F. Supp. 2d at 1000).

Commerce maintains that it "did not need to isolate indirect
labor cost from SKF India's data," Def.'s Mem at 28, because "'both
direct and indirect labor figures are part of th[e] calculation .

. . .'"   Id. at 27-28 (quoting Final Results, 62 Fed. Reg. at 61,288).


###      c.   Analysis

Timken is correct in pointing out that Commerce is under a "duty to calculate dumping margins as accurately as possible." Def.'s Mem. at 47 (citing to Olympia Indus. 22 CIT at 390, 7 F. Supp. 2d at 1000).  While this statement implied that Commerce is under the obligation to seek and use the best information available, it does not mean that Commerce is bound to any particular mode of collecting such information. See, e.g., Floral Trade Council v. United States, 17 CIT 1417, 1418-19 (1993) (explaining that "the burdens on the requester are those caused by the mechanics of triggering the review that is actually desired. In practical terms, these burdens should be minimal").

In the case at hand, Commerce, faced with a multitude of unclear and questionable data, see Pl.'s Reply at 18-19, determined a ratio that minimized the error (that ensued from the use of imperfect statistics) by including  "both direct and indirect labor figures [as] part of th[e] calculation . . . ." Def.'s Mem. at 28 (quoting Final Results, 62 Fed. Reg. at 61,288).

Timken seems to be under the impression that Commerce is bound to Commerce's practice of "bas[ing] its cost calculations on the [COM] which includes . . . direct [but not indirect] labor." Pl.'s Mem. at 46 (citing CHRISTIAN MARSH, USE AND MEASUREMENT OF PRODUCTION COSTS UNDER U.S. ANTIDUMPING LAW 21 (1995)).  This assumption is incorrect. While Commerce might strive for a calculation based solely on direct labor costs, an internally consistent formula that minimizes the error by the usage of the same imperfect data in the formula's numerators and denominator presents a reasonable alternative. See generally, Chevron, 467 U.S. at 844-45.  Consequently, Commerce could choose one reasonable mode of calculating or collecting the best information available over another mode.  See id.; see also supra discussion in Part A(3)(a)(ii) (addressing agency's prerogative to choose a reasonable method or alter its policies and goals).   Based on the foregoing, the Court finds Commerce's decision to calculate COM on the basis of both direct and indirect labor costs in accordance with law.

   2.   **Commerce's Calculation of SKF India's COM by Applying Percentages Reported in Labor Hours to SKF India's Labor Costs.**

          a.   **Background**

During the review at issue, Commerce collected the information by distributing a questionnaire which, among other things, sought

data about labor hours but not labor costs.  <u>See</u> Pl.'s Mem., App. Pub. Doc. 8.    Consequently, Commerce calculated SKF India's ratios, <u>e.g.</u>, overhead cost to the cost of total material and labor, on the basis of relative hours, not costs.  <u>See</u> <u>Final Results</u>, 62 Fed. Reg. at 61,288.  Commerce then applied these ratios to Chinese surrogate cost representing total materials and total direct and indirect labor costs.  <u>Id.</u>

### b.    Exhaustion of Remedies

### i.    Contentions of the Parties

As a preliminary matter, Commerce contends that the issue of whether Commerce properly calculated SKF India's COM by applying percentages reported in labor hours to labor costs should not be examined by this Court because Timken failed to question this issue before Commerce and, therefore, forfeited its right to judicial review.  <u>See</u> Def.'s Mem. at 28.

Timken alleges that the issue was sufficiently presented for Commerce's consideration when Timken discussed it during the course of administrative review.  <u>See</u> Pl.'s Reply at 21 n.13 (citing to Timken's Case Brief (Aug. 8, 1997), Pl.'s Mem., App. B.

### ii.  Analysis

The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court. <u>See Unemployment Compensation Comm'n of Alaska v. Aragon</u>, 329 U.S. 143, 155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action").[5]

---

[5]      There is, however, no absolute requirement of exhaustion in the Court of International Trade in non-classification cases. <u>See Alhambra Foundry Co. v. United States</u>, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. <u>See</u> <u>Cemex, S.A. v. United States</u>, 133 F.3d 897, 905 (Fed. Cir. 1998).  Therefore, because "each exercise of judicial discretion [does] not requir[e] litigants to exhaust administrative remedies," the Court is authorized to determine proper exceptions to the doctrine of exhaustion. <u>Alhambra Foundry</u>, 12 CIT at 347, 685 F. Supp. at 1256 (citing <u>Timken Co. v. United States</u>, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986) <u>rev'd in part on other grounds</u> <u>Koyo Seiko Co. v. United States</u>, 20 F.3d 1156 (Fed. Cir. 1994)).

In the past, the Court has exercised its discretion to obviate exhaustion where: (1) requiring it would be futile, <u>see</u> <u>Rhone Poulenc, S.A. v. United States</u>, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) ("it appears that it would have been futile for plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a

     The purpose behind the doctrine of exhaustion is to prevent

courts from premature involvement in administrative proceedings,

and to protect agencies "from judicial interference until an

administrative decision has been formalized and its effects felt in

a concrete way by the challenging parties."   Abbott Labs. v.

Gardner, 387 U.S. 136, 148-49 (1967); see also Public Citizen

Health Research Group v. Comm'r, FDA, 740 F.2d 21, 29 (D.C. Cir.

1984) (pointing out that the "exhaustion doctrine . . . serv[es]

four primary purposes: [(1)] it ensures that persons do not flout

[legally] established administrative processes . . . ; [(2)] it

protects the autonomy of agency decision making; [(3)] it aids

judicial review by permitting factual development [of issues

relevant to the dispute]; and [(4)] it serves judicial economy by

avoiding [repetitious] administrative and judicial fact finding and

_____

useless formality" as in the case where "there is no relief which
plaintiff may be granted at the administrative level," United
States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F.
Supp. 883, 887 (1982); (2) a subsequent court decision has
interpreted existing law after the administrative determination at
issue was published, and the new decision might have materially
affected the agency's actions, see Timken, 10 CIT at 93, 630 F.
Supp. at 1334; (3) the question is one of law and does not require
further factual development and, therefore, the court does not
invade the province of the agency by considering the question, see
id.; R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1337-39
(D.C. Cir. 1983); and (4) plaintiffs had no reason to suspect that
the agency would refuse to adhere to clearly applicable precedent.
See Philipp Bros., Inc. v. United States, 10 CIT 76, 80, 630 F.
Supp. 1317, 1321 (1986).

by . . . resolving sole claims without judicial intervention," citation omitted).

While a plaintiff cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument, plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it. See generally, Hormel v. Helvering, 312 U.S. 552, 557 (1941); see also Rhone Poulenc, 899 F.2d at 1191. An agency's failure to address plaintiff's challenge, however, does not invoke the exhaustion doctrine and shall not result in forfeiture of plaintiff's judicial remedies. See generally, B-West Imports, Inc. v. United States, 19 CIT 303, 306, 880 F. Supp. 853, 858 (1995). An administrative decision not to address the issue cannot be dispositive of the question whether or not the issue was properly brought to the agency's attention. See, e.g., Allnutt v. United States DOJ, 2000 U.S. Dist. LEXIS 4060 (D. Md., 2000).

During the review, Timken addressed the issue of percentage derivative from the labor hours information and contrasted it with the terms of labor costs, supplying emphasis and providing tables that highlighted the distinction between the terms. See Pl.'s Mem., App. B at 43-44. While Timken did not spell out its claim

that Commerce "erred in calculating SKF [India's] COM by applying . . . percentages reported in labor hours to SKF [India's] total labor <u>costs</u>," Pl.'s Mem. at 46 (emphasis in original), this Court finds that Timken's submission during the review sufficiently availed Commerce with an opportunity to address the issue.  The Court, therefore, concludes that Timken properly exhausted its administrative remedies and is in right to raise this issue to the Court.

### c.   Commerce's Application of Labor Hours to Labor Costs

#### i.   Contentions of the Parties

Timken contends that Commerce could not "allocate[] labor costs using the quantity of . . . labor hours [spent] without taking into account the fact that indirect labor hours are more expensive" and, thus, the ratio could not be the same. Pl.'s Reply at 21.

#### ii.  Analysis

Commerce's administrative duties include Commerce's responsibility to undertake reasonable investigatory functions. See <u>Freeport Minerals Co. v. United States</u>, 776 F.2d 1029, 1034

(Fed. Cir. 1985) (stating that Commerce errs if it refuses to require respondents to submit pertinent information); Wieland-Werke AG v. United States, 22 CIT 129, 135, 4 F. Supp. 2d 1207, 1212 (1998) ("Commerce has an obligation to investigate by gathering information either on its own initiative or through submissions to it," citation omitted); Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 578, 927 F. Supp. 451, 456 (1996) ("Commerce's failure to perform an independent investigation of the facts related to this issue falls short of its statutory duty to investigate antidumping cases and assign fair antidumping margins.")

During the review at issue, Commerce collected the information by distributing a questionnaire which, among other things, sought the data about labor hours but not labor costs and used the data to calculate SKF India's ratios. See Pl.'s Mem., App. Pub. Doc. 8; see also Final Results, 62 Fed. Reg. at 61,288. The percentage of direct labor hours within total labor hours does not, however, necessarily correspond with the percentage of direct labor cost within total labor costs. Conversely, under a traditional business scheme, indirect workers, that is, usually a few skilled laborers, earn higher salaries (and, thus, cost more) while work en masse less man-hours than direct workers, that is, more numerous yet less skilled employees, earning lower salaries while putting in en masse more man-hours. Indeed, there is evidence on record that Indian

indirect labor rates are considerably higher than direct ones and create a ratio different from that between indirect and direct labor hours.  See Pl.'s Mem., App. B, C.

While Commerce was entitled to choose a reasonable mode of gathering information, see, e.g., Floral Trade Council, 17 CIT at 1418-19, Commerce could not unreasonably forfeit its duty to collect significantly important data.[6]  Accord Freeport Minerals, 776 F.2d at 1034; Wieland-Werke, 22 CIT at 135, 4 F. Supp. 2d at 1212; Rhone-Poulenc, 20 CIT at 578, 927 F. Supp. at 456.  Commerce has presented no explanation for its failure to collect data on labor costs.  See generally, Def.'s Mem. at 28.  This error in data collection significantly affected Commerce's determination and violated Commerce's "duty to calculate dumping margins as accurately as possible."  Olympia Indus., 22 CIT at 390, 7 F. Supp. 2d at 1000.  Therefore, this Court finds that Commerce's "failure to collect pertinent data or to consider a relevant aspect of the issue, constitute[d] an abuse of discretion," Timken Co. v. United States, 10 CIT at 97, 630 F. Supp. at 1337-38, remands this issue

_____

[6] While Commerce was justified in utilizing a reasonable formula that involved direct and indirect labor costs, see supra the discussion in Part C(1)(c), Commerce was not entitled to determine direct labor costs on the basis of the obviously divergent ratio of direct to indirect labor hours.

to Commerce to determine direct labor costs without relying on labor hours and open the record, if necessary.

## D.    Commerce's Inclusion of "Purchases of Traded Goods" in SKF India's COM

### 1.    Background

In the <u>Final Results</u>, Commerce designated the line item "purchases of traded goods" in SKF India's 1995-96 Financial Statement as a material cost to be included in the COM that was used as the denominator of the overhead, SG&A, and profit-rate calculations. <u>See</u> 62 Fed. Reg. at 61,288. These "traded goods" included purchased finished and semi-finished goods. <u>Id.</u>

### 2. Contentions of the Parties

Timken asserts that the "purchases of traded goods" should be excluded from the COM denominator used in the overhead, SG&A and profit-rate calculations. <u>See</u> Pl.'s Mem. at 47. Timken notes that since the "traded goods" are products that are purchased and sold by SKF India, and since they are already manufactured and do not affect production, "traded goods" are not overhead or SG&A and are not material costs used in producing the subject merchandise. <u>See</u> <u>id.</u>; <u>see also</u> Pl.'s Reply at 22.

Commerce responds that while SKF India did not incur direct raw-material or direct labor expenses for such "traded goods," SKF India incurred the expense of purchasing them. See Def.'s Mem. at 29. Because the "purchases of traded goods" are included in the calculation of the costs of goods sold, Commerce claims that they are "ordinary business expenses" and a reflection of "manufacturers' common practice of purchasing." Id. Commerce, therefore, argues it acted reasonably and in accordance with law by including the "purchases of traded goods" as part of the COM calculation. See id.

Peer Bearing agrees with the position taken by Commerce, arguing that since the "purchases of traded goods" are semi-finished or finished goods, that is, the type of items which are routinely purchased, stored and maintained by manufacturers, they are material costs and, therefore, should not be excluded from SKF India's costs of materials. See Peer Bearing's Resp. at 14.

### 3. Analysis

The statute specifically instructs Commerce to determine "the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise

and to which shall be added an amount for general expenses and profit . . . ."  19 U.S.C. § 1677b(c)(1) (emphasis supplied).

Therefore, the Court disagrees with Commerce's determination. Although SKF India's Financial Statement stated that the "purchases of traded goods" were required to meet SKF India's clients' demands, see Def.'s Mem. at 29, Commerce "failed to demonstrate how these already manufactured goods constitute a material cost incurred in [the process of] manufacturing the subject merchandise."  Timken, 23 CIT at ___, 59 F. Supp. 2d at 1379 (emphasis supplied).  The Court, therefore, remands this issue to Commerce to exclude the "purchases of traded goods" from its calculation of COM.

**E.    Commerce's Calculation of Marine Insurance**

In its final determination, Commerce calculated marine insurance using a publicly available rate for sulphur dyes and multiplying this rate by the packed weight of the merchandise at issue, specifically, bearings.  See Final Results, 62 Fed. Reg. at 61,288.  As this Court pointed out in Peer Bearing Co., 22 CIT at 485-86, 12 F. Supp. 2d at 458-59, and Timken, 23 CIT at ___, 59 F. Supp. 2d at 1380, Commerce's reliance on a weight-based methodology was flawed.

Insurers agreeing to pay the value of merchandise lost or destroyed in transit base their premium rates on what it would cost to replace the merchandise or compensate the losses rather than upon the weight of the merchandise being shipped.  See Peer Bearing, 22 CIT at 486, 12 F. Supp. 2d at 458-59 ("Insurance by definition is based upon pecuniary valuation, not on the weight of the product to be insured").  The Court, therefore, remands this issue to Commerce to determine marine insurance in a manner related to the value and the risk of transporting tapered roller bearings.

**F.    Commerce's Determination that Certain Chinese Suppliers Sales Were Made Without Knowledge of the Ultimate Destination**

**1.    Statutory background**

Section 1677a(a) of Title 19 defines the term "export price" as "the price at which the subject merchandise is first sold . . . before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . ."  19 U.S.C. § 1677a(a) (1994).  In determining at which point such first sale for exportation to the United States occurs, Commerce applies the "knowledge" test that requires a supplier to have knowledge that

the ultimate destination of its goods is the United States before

the supplier's prices are considered export prices.[7]  See, e.g.,

NSK Ltd. v. United States, 21 CIT 617, 645-46, 969 F. Supp. 34,

60-61 (1997). Specifically, Commerce determines whether suppliers

actually knew rather than suspected that particular sales at issue

were destined for import into the United States.  See id., 21 CIT

at 644-46, 969 F. Supp. at 59-61.  Thus, it is not enough for

foreign suppliers to have merely a general belief that the

---

[7]Section 1677a(b) of Title 19 states that constructed price is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States . . . ." 19 U.S.C. § 1677a(b) (1994). The legislative history to this section clearly demonstrates that Commerce's knowledge test was anticipated by Congress and is a reasonable interpretation of the statute.

In enacting a new antidumping law as part of the Trade Agreements Act of 1979, Congress modified the definition of purchase price, hence establishing the basis for Commerce's administrative practice of looking to a producer's knowledge in determining whether to use the producer's sales price as the purchase price. Congress stated the following:

> If a producer knew that the merchandise was intended for sale to an unrelated purchaser in the United States under terms of sale fixed on or before the date of importation, the producer's sale price to an unrelated middleman will be used as the purchase price.

S. Rep. No. 96-249, at 94 (1979), reprinted in U.S.C.A.A.N. 381, 480; see also H. Doc. 96-153, at 411 (1979) ("The definition makes clear that if the producer knew or had reason to know the goods were for sale to an unrelated U.S. buyer, . . . the producer's sales price will be used as 'purchase price' . . . .") Furthermore, in 1984 Congress explicitly amended Section 1677a(b) to recognize that a reseller's price may be used as purchase price. See H.R. Conf. Rep. No. 98-1156, at 185 (1984), reprinted in U.S.C.A.A.N. 5220, 5302.

merchandise may eventually make its way to the United States. Moreover, the fact that the merchandise was at least offered for sale in a market other than the United States is interpreted as suggesting against suppliers having the requisite knowledge. See id., 21 CIT at 646, 969 F. Supp. at 61.

While Commerce's application of such a high standard is exploitable by the "perfect" scenario, where a reseller could conceal the ultimate destination of its purchases from its foreign suppliers, it is recognized that the "knowledge" test is necessary to fulfill the statutory intent that purchase price be based on sales of goods sold abroad with the intent of being exported to the United States. Id.

### 2.    Factual Background

The record of the review at issue indicated that Peer Bearing, a United States company, purchased the merchandise, all identified with the word "Peer" at the request of Peer Bearing, from a few Chinese suppliers through Chin Jun, a Hong Kong reseller used by Peer Bearing.[8]  See Final Results, 62 Fed. Reg. at 61,291; Pl.'s

---

[8] Timken also argues that Commerce should have treated all sales made by Chinese suppliers to another exporter, Premier, as export price sales because Premier's suppliers made some shipments directly from China to the United States.  Timken asserts that such

Mem., App. Pub. Doc. 54.  Peer Bearing had notified the Chinese
suppliers that the merchandise was intended to be sold around the
world.  See id., App. Pub. Doc. 205.

After examining these facts, Commerce concluded that the
record indicated a mere possibility of Chinese suppliers assuming
the ultimate destination of the merchandise, and that such
possibility did not amount to sufficient evidence of the suppliers'
knowledge that Chin Jun would sell the merchandise to the United
States.  See Final Results, 62 Fed. Reg. at 61,292.  Consequently,
for the purpose of determining the dumping margin, Commerce decided
to use, as export price sales, the sales of the merchandise by Chin
Jun to Peer Bearing rather than the sales by Chinese suppliers to
Chin Jun.  See id.  Commerce pointed out that the suppliers
themselves did not export the merchandise, but rather the
merchandise was shipped to "freight forwarders who were responsible
for arranging shipment[s] to the United States and were the only
parties [(]other than [United States importers) that] knew the
ultimate destination" of the merchandise.  Id. at 61,292.

---

few shipments establishes the suppliers' knowledge of the export
destination.  See Final Results, 62 Fed. Reg. at 61,291-92.  The
Court's analysis with regard to those sales parallels the Court's
analysis of the sales made by Chinese suppliers to Chin Jun.

### 3.   Contentions of the Parties

Timken argues that Commerce's determination was erroneous, and the price paid between Chin Jun and its suppliers should be used to calculate United States price.  See Pl.'s Mem. at 52-53.  Timken also alleges that because the fact that the merchandise was marked "Peer" indicates that the Chinese suppliers had sufficient knowledge about the ultimate destination of the merchandise.  See id. at 52 (comparing the case at bar and NSK Ltd., 21 CIT 617, 969 F. Supp. 34).  Alternatively, Timken suggests that the suppliers' lack of knowledge about the destination shall be disregarded because it emanated from Chin Jun and Peer Bearing's effort to mislead the suppliers into believing that the merchandise was to be sold worldwide.   See id.; see also Pl.'s Reply at 23 (citing Cliquot's Champagne, 70 U.S. 114, 140 (1866), and pointing out that Commerce should have imputed knowledge upon a freight forwarder operating for the benefit of its principal.)

Commerce maintains that: (1) Commerce's application of the knowledge test was proper; and (2) Commerce's determination was supported by substantial evidence.  See Def.'s Mem. at 30-32.

Peer Bearing supports Commerce's argument.  See generally, Peer Bearing's Resp. at 14-19.   Peer Bearing notes that the

Chinese suppliers had only knowledge of the destination of their sales to Chin Jun but not to Peer Bearing, see id. at 15-16, and alleges that the fact that the merchandise was marked "Peer" is not dispositive because "Peer [Bearing] sells its [merchandise] in numerous countries around the world[, and it] is not uncommon for companies such as Peer [Bearing] and [even] Timken [itself] to use their brand names for sales made throughout the world." Id. at 16 (emphasis omitted).

4.   Analysis

The crux of Timken's argument is that "special markings" on the merchandise meant that the Chinese suppliers knew that the merchandise was destined for the United States. See Pl.'s Mem. at 53. The Court disagrees. Just because a factory produces a piece of merchandise with the mark "Peer," it does not necessarily mean, unless there is additional evidence, that such merchandise is destined for the United States. Moreover, even if the merchandise is destined for the United States, it does not necessarily mean, unless there is additional evidence, that the manufacturer made the connection between the marking and the final purchaser who sells its stock in the United States as well as in third countries.[9]

_____

[9] This is precisely the scenario of the case at bar. Part of the merchandise went to Hong Kong and was re-shipped therefrom; the

Finally, even if such mental connection was made by the
manufacturer, it does not necessarily mean, unless there is
additional evidence, that such connection created the requisite
level of "knowledge."[10]   The test employed by Commerce is not

---

other part was shipped from the PRC through a freight forwarder (as
in the case of Premier), and only some of those shipments made
their way into the United States.

[10]     Timken asserts that Commerce "has consistently included
among [United States] sales those 'in which a manufacturer . . .
has reason to know of the ultimate destination of the merchandise
at the time of sale, through special markings . . . .'"  See Pl.'s
Mem. at 53 (quoting Final Results of Antidumping Duty
Administrative Review of Titanium Sponge From Russia ("Titanium
Sponge"), 61 Fed. Reg. 9676, 9677 (Mar. 11, 1996), emphasis
omitted, and citing Final Results of Antidumping Duty
Administrative Review and Partial Termination of Administrative
Review of Fresh Garlic From the People's Republic of China ("Fresh
Garlic I"), 62 Fed. Reg. 23,758, 23,759 (May 1, 1997); Preliminary
Results of Antidumping Duty Administrative Review and Partial
Termination of Administrative Review of Fresh Garlic From the
People's Republic of China ("Fresh Garlic II"), 61 Fed. Reg.
68,229, 68,230 (Dec. 27, 1996)).

     The Court is bewildered by the choice of Commerce's
determinations relied upon by Timken.  In Titanium Sponge, Commerce
rejected a respondent's contention that the respondent had reached
the requisite knowledge because a manufacturer was neither
"informed in advance that the merchandise [was] destined for the
United States," nor had "reason to know of the ultimate destination
of the merchandise at the time of sale, through special markings,
market-specific specifications, or shipping instructions." 61 Fed.
Reg. at 9677 (citations omitted).  In Fresh Garlic I and II,
Commerce provided that only the use of a very precise procedure by
the manufacturer would create the requisite level of knowledge.
See 62 Fed. Reg. at 23,759 and 61 Fed. Reg. at 68,230 (stating that
the merchandise had to be "mechanically harvested and primarily,
but not exclusively, destined for non-fresh use, or specially
prepared and cultivated prior to planting and then harvested and
otherwise prepared," emphasis supplied).

whether, in theory, the merchandise could have arrived in the United States, but rather whether the Chinese suppliers knew or should have known where the merchandise was destined.  See Final Results, 62 Fed. Reg. at 61,292; accord NSK, Ltd., 21 CIT at 644-46, 969 F. Supp. at 59-61.

Therefore, Commerce could reasonably find that there was no evidence that the Chinese suppliers had knowledge[11] that the

_____

In fact, more often than not, Commerce finds presence of neither markings nor specifications, or instructions special enough to create the requisite level of knowledge. See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Ferrovanadium and Nitrided Vanadium From the Russian Federation, 60 Fed. Reg. 27,957 (May 26, 1995); Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium and Alloy Magnesium From the Russian Federation, 60 Fed. Reg. 16,440 (Mar. 30, 1995); Final Results of Antidumping Duty Administrative Review of Television Receivers, Monochrome and Color, From Japan, 58 Fed. Reg. 11,211 (Feb. 24, 1993); Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al., 57 Fed. Reg. 28,360, 28,423 (June 24, 1992); Final Results of Antidumping Duty Administrative Reviews [of] Oil Country Tubular Goods From Canada, 55 Fed. Reg. 50,739 (Dec. 10, 1990); Final Results of Antidumping Duty Administrative Review of Natural Bristle Paint Brushes and Brush Heads From the People's Republic of China, 55 Fed. Reg. 42,599 (Oct. 22, 1990); Final Determination of Sales at Less Than Fair Value of Urea From the Union of Soviet Socialist Republics, 52 Fed. Reg. 19,557 (May 26, 1987).

[11] Timken also argues that Commerce should have imputed knowledge upon the Chinese manufacturers under the precedent of Cliquot's Champagne, 70 U.S. at 140. See Pl.'s Reply at 23.  The Court in Cliquot's Champagne, however, never addressed the issue of "imputed knowledge," rather it examined the issue of whether a mens rea of "knowingly" under a statute envisioning criminal prosecution could be asserted against an agent of a principal that committed a

ultimate destination of the merchandise was the United States, and

disregard the sale prices from the Chinese suppliers to Chin Jun in

Commerce's determination of the starting price.    Accord Final

Results, 62 Fed. Reg. at 61,291-92.

## G.    Commerce's Clerical Error

In its final determination, Commerce, while calculating the

weight of scrap from one of the Chinese producers, committed a

clerical error.    See Def. Mem. at 32.    The Court remands the issue

to Commerce to correct the error.

---

wrongful act.    See 70 U.S. at 114, 140.    Considering that: (1)
Timken itself reads Cliquot's Champagne as a case discussing an
agency-based relationship between a freight forwarder and the
freight forwarder's principal, see Pl.'s Reply at 23; and (2) under
international trade practices, a shipper, an importer, or an
exporter are the only parties that may serve as a principal to a
freight forwarder-agent, see e.g., Pearson v. Leif Hoegh, 1992 U.S.
App. LEXIS 450 (4th Cir. Jan. 16, 1992); Gilmore v. Waterman S.S.
Corp., 790 F.2d 1244 (5th Cir. 1986); Zanelli v. FMC, 524 F.2d 1000
(5th Cir. 1975); Orient Mid-East Lines v. Albert E. Bowen, Inc., 458
F.2d 572 (2nd Cir. 1972); Thiti Lert Watana Co. v. Minagratex Corp.,
105 F. Supp. 2d 1077 (N.D. Ca. 2000), this Court fails to
understand how the holding of Cliquot's Champagne could serve as a
precedent creating a connection between a freight forwarder and a
manufacturer, that is, a third-party who is neither a shipper, nor
an importer or an exporter and, thus, cannot be the freight
forwarder's principal.

## CONCLUSION

The case is remanded to Commerce to: (1) determine direct labor costs without relying on labor hours and to open the record, if necessary; (2) exclude the "purchases of traded goods" from its calculation of COM; (3) adjust United States price by recalculating marine insurance pursuant to a value-based methodology; and (4) correct clerical errors in the calculation of the weight of scrap from one of the Chinese producers. Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated:      August 9, 2001
            New York, New York