**Slip Op. 04-125**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE RICHARD W. GOLDBERG, SENIOR JUDGE**

| | |
|---|---|
| TIANJIN MACHINERY IMPORT & EXPORT CORP., LIAONING MACHINERY IMPORT & EXPORT COMPANY, SHANDONG HUARONG GENERAL GROUP CORP., AND SHANDONG MACHINERY IMPORT & EXPORT CORP., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> AMES TRUE TEMPER, <br><br> Defendant-Intervenor. | Court No. 02-00637 |

[Court sustains <u>Final Results</u>; Commerce's fifteen-day liquidation policy not in accordance with law.]

Dated: October 4, 2004

<u>Hume & Associates PC</u> (<u>Robert T. Hume</u>) for Plaintiffs Tianjin Machinery Import & Export Corp. and Shandong Huarong General Group Corp.

<u>Peter D. Keisler</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Jeanne E. Davidson</u>, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Stephen C. Tosini</u>); <u>Barbara J. Tsai</u>, Of Counsel, Office of Chief Counsel for Import Administration, United States Department of Commerce, for Defendant United States.

<u>Wiley Rein & Fielding LLP</u> (<u>Eileen P. Bradner</u>) for Defendant-Intervenor Ames True Temper.

**OPINION**

**GOLDBERG, Senior Judge**: In this action, Plaintiffs Tianjin
Machinery Import & Export Corp. ("TMC") and Shandong Huarong
General Group Corp. ("Huarong") (collectively "Plaintiffs")[1]
challenge the final determination of the United States Department
of Commerce ("Commerce") in the tenth administrative review of
antidumping duty orders covering heavy forged hand tools in Heavy
Forged Hand Tools From the People's Republic of China: Final
Results and Partial Rescission of Antidumping Duty Administrative
Review and Determination Not To Revoke in Part, 67 Fed. Reg.
57789 (Sept. 12, 2002) ("Final Results").[2]  The Final Results
covers the period of review from February 1, 2000 through January
31, 2001.  Pursuant to USCIT Rule 56.2, Plaintiffs move for
judgment on the agency record.

---

[1] Plaintiffs Liaoning Machinery Import & Export Company and
Shandong Machinery Import & Export Corp. were removed from the
case pursuant to Plaintiffs' Second Amended Complaint filed on
November 8, 2002.  Second Am. Compl. at 1.

[2] After Commerce issued its Final Results, Plaintiffs and
Defendant-Intervenor Ames True Temper filed ministerial error
allegations with Commerce.  See Hand Tools From the People's
Republic of China – Clerical Errors In Final Determination,
Proprietary Appendix to Motion of Plaintiffs Tianjin Machinery
Import & Export Corp. and Shandong Huarong General Group Corp.
for Judgment on the Agency Record ("Pls.' Conf. App.") at Ex. 5
(Sept. 16, 2002).  On February 6, 2003, Commerce responded to the
parties' allegations by issuing its Final Results of
Redetermination Pursuant to Court Remand, see id. at Ex. 4, which
Plaintiffs also challenge.  Because the relevant portions of the
Final Results of Redetermination Pursuant to Court Remand merely
reiterate Commerce's stance in the Final Results, the Court will
refer to both determinations collectively as the "Final Results."

    For the reasons that follow, the Court sustains the Final Results, but finds that Commerce's new policy of issuing liquidation instructions within fifteen days of publication of the final results of review is not in accordance with law.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and (i).

## I.   STANDARD OF REVIEW

    The Court will sustain the Final Results unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  To determine whether Commerce's construction of the statutes is in accordance with law, the Court looks to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  The first step of the test set forth in Chevron requires the Court to determine "whether Congress has directly spoken to the precise question at issue."  Id. at 842.  It is only if the Court concludes that "Congress either had no intent on the matter, or that Congress's purpose and intent regarding the matter is ultimately unclear," that the Court will defer to Commerce's construction under step two of Chevron.  Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998).  If the statute is ambiguous, then the second step requires the Court to defer to the agency's interpretation so long as it is "a permissible construction of the statute."  Chevron, 467 U.S. at

842. In addition, "[s]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron." Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001) (interpreting United States v. Mead, 533 U.S. 218 (2001)). Accordingly, the Court will not substitute "its own construction of a statutory provision for a reasonable interpretation made by [Commerce]." IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992).

## II.  DISCUSSION

**A.  Commerce's Decision to Apply Adverse Facts Available to the Packing Factor of Production for TMC's Hammers/Sledges Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

For the cost portion of TMC's verification, Commerce preselected one of TMC's three hammer factories. See Defendant's Response in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("Def.'s Br.") at 6. When Commerce arrived at the factory, Commerce discovered that it had closed approximately ten months before verification. See Verification Report (TMC's Hammer Factory), Defendant's Appendix to Defendant's Response in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("Def.'s App.") at Ex. 7 (July 24, 2002). As a result, there were no packing materials present that Commerce could weigh to verify the packing factors reported in the review. Id. at 8. Moreover, there were no

records available documenting the weights of the packing materials. See id. Commerce concluded that adverse inferences were warranted, and therefore applied the highest reported packing rate as adverse facts available ("AFA") for all of TMC's hammers, regardless of whether they were made by the closed factory or not. See Issues and Decision Memorandum for the Administrative Reviews of Heavy Forged Hand Tools from the People's Republic of China – February 1, 2000 through January 31, 2001, Def.'s App. at Ex. 11 at Cmt. 22 (Sept. 3, 2002) ("Issues and Decision Memo"); Memorandum of Points and Authorities in Support of Motion of Plaintiffs Tianjin Machinery Import & Export Corp. and Shandong Huarong General Group Corp. for Judgment on the Agency Record ("Pls.' Br.") at 9.

The asserted basis for Commerce's decision to apply AFA is that "TMC was responsible for demonstrating the reliability of its own data, [and] its failure to do so supports [the] conclusion that [TMC] did not act to the best of its ability." Issues and Decision Memo at Cmt. 22. Commerce assumes that "when a respondent prepares its response, it [will] maintain the records which were used to compile its data." Id. Furthermore, Commerce reasons that because TMC maintained records for a variety of reported factors of production despite the closure of its factory, "[i]t is . . . reasonable to assume that [TMC] would have maintained records for all reported [factors of

production,]" including packing factors. Id. Thus, Commerce concluded that TMC's failure either to maintain packing records or to provide actual packing materials for weighing constituted a failure to act to the best of its ability, warranting application of AFA. See id.

Before Commerce is allowed to apply AFA, Commerce must find that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information[.]" 19 U.S.C. § 1677e(b). "The statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). For Commerce to conclude that a respondent failed to cooperate to the best of its ability and to draw an adverse inference under 19 U.S.C. § 1677e(b), Commerce need only make two showings.

> First, it must make an objective showing that a reasonable and responsible [respondent] would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

Id. at 1382-83 (internal citation omitted); see also China Steel
Corp. v. United States, 28 CIT __, __, 306 F. Supp. 2d 1291, 1304
(2004).

The first requirement is easily satisfied. As the Court has
held, "[t]here can . . . be no doubt that a reasonable and
responsible producer, seeking an administrative review, will have
accurate records of its factors of production." Shandong Huarong
Gen. Group Corp. v. United States, 27 CIT __, __, Slip Op. 03-135
at 36 (Oct. 22, 2003).

With regard to the second requirement, it is undisputed that
TMC did not provide either packing materials for weighing[3] or
records documenting packing weights, even though Commerce
expressly notified TMC in advance that packing materials and
documentation would be required for verification. See
Verification Agenda Outline for TMC, Def.'s App. at Ex. 3 at 10
(Apr. 9, 2002). TMC claims that it has never maintained records
of packing weights, but rather, has always provided and verified

_____

[3] TMC's failure to provide packing materials for weighing
was due, at least in part, to the fact that the factory selected
for verification was closed and no longer had any inventory
present. However, TMC conceded at oral argument that it could
have furnished packing materials from another factory to be
weighed as a substitute. See Oral Argument Tr. at 47 ("Could we
have given packing material for a second factory . . . ? That is
a possibility and, to my knowledge, that . . . option was never
discussed."). In light of this admission, the Court is reluctant
to conclude that TMC put forth its maximum effort in providing
Commerce with materials for weighing. It is unnecessary for the
Court to reach this issue, however, since TMC's failure to
maintain records of packing weights is dispositive.

packing data by weighing actual inventory.  Plaintiffs' Reply Brief ("Pls.' Reply Br.") at 8.  Thus, TMC asserts, short of weighing inventory, there is no way to verify packing weights. See id.

TMC's argument is unpersuasive.  A respondent's failure to maintain required records is not an adequate defense to a determination by Commerce that the respondent failed to act to the best of its ability.  The Court of Appeals for the Federal Circuit has clearly articulated that "the [best of ability] standard does not condone . . . inadequate record keeping." Nippon Steel, 337 F.3d at 1382.  It assumes that respondents are familiar with the rules and regulations that apply, and requires respondents to "take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable [respondent] should anticipate being called upon to produce[.]"  Id.

TMC has not adduced any evidence to suggest that maintaining packing records would be impossible, or even impracticable; rather, TMC merely asserts that its methodology does not involve maintaining packing records.  TMC's assertion supports the subjective showing by Commerce that TMC's failure to respond fully is the result of its own lack of cooperation in failing to keep and maintain all required records.  As such, the Court concludes that the second requirement for applying AFA is met.

Accordingly, the Court finds Commerce's conclusion that TMC failed to cooperate by not acting to the best of its ability, and its consequential decision to apply AFA to TMC's packing factor of production, to be supported by substantial evidence and otherwise in accordance with law.

**B. Commerce's Decision to Apply Adverse Facts Available for Wooden Pallets to All of TMC's Hammers Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

TMC challenges Commerce's decision to apply AFA for wooden pallets to all of TMC's hammers, regardless of whether they were made by the factory that failed verification. During the review, TMC reported that one of its factories did not use wooden pallets at all, while other factories only used wooden pallets for some hammers. See Heavy Forged Hand Tools from China – TMC Additional Response to the Department's December 6, 2001, Supplemental Questionnaire, Pls.' Conf. App. at Ex. 10 (Feb. 6, 2002). Moreover, TMC's sales documents (specifically, the bills of lading) indicate whether the hammers were placed on wooden pallets, metal pallets, or no pallets. See Sample Sales Traces TMC, id. at Ex. 9. Thus, TMC objects to Commerce's application of AFA to all hammers sold, regardless of whether they were shipped on pallets. See Pls.' Br. at 31-32. TMC asserts that even if Commerce was justified in applying AFA to its packing factor of production, Commerce erred in applying AFA to pallets for all of its hammer factories. See id. at 31.

    TMC's argument attempts to distinguish pallets from the packing factor of production.  Commerce's verification methodology, however, does not permit this distinction to be drawn.  In fact, Commerce's methodology <u>includes</u> pallets in the packing factor of production, and does not contemplate using information from sales documents to verify packing factors.  <u>See</u> Verification Agenda Outline for TMC, Def.'s App. at Ex. 3 at 10 (Apr. 9, 2002); Def.'s Br. at 34.  As a result, TMC's argument hinges on the invalidity of Commerce's verification methodology.

    The Court reviews Commerce's verification procedures for an abuse of discretion.  <u>Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States</u>, 268 F.3d 1376, 1383-84 (Fed. Cir. 2001) (citing <u>Micron Tech., Inc. v. United States</u>, 117 F.3d 1386, 1396 (Fed. Cir. 1997)).  While "all information relied upon in making . . . a final determination in a review" is required to be verified under 19 U.S.C. § 1677m(i)(1), the statute does not delineate the precise means for conducting verification.  19 U.S.C. § 1677m(i)(1) (1994).  Rather, "[t]he decision to select a particular [verification] methodology rests solely within Commerce's sound discretion."  <u>Hercules, Inc. v. United States</u>, 11 CIT 710, 726, 673 F. Supp. 454, 469 (1987).  Moreover, in selecting its verification procedures, Commerce is given "wide latitude," <u>see</u> <u>Am. Alloys, Inc. v. United States</u>, 30 F.3d 1469, 1474 (Fed. Cir. 1994), and is owed "considerable

deference" by the Court.  See <u>Daewoo Electronics Co. v. United States</u>, 6 F.3d 1511, 1516 (Fed. Cir. 1993).

In the instant case, Commerce's decision not to use information contained in TMC's sales documents to verify TMC's packing factors is reasonable.  The sales and cost portions of verification are conceptually distinct and are conducted for separate purposes.  The sales portion is undertaken to verify sales information (such as the type of merchandise shipped, the port of loading, and shipper expenses) by examining sample bills of lading.  The cost portion is conducted to verify factor of production information (such as packing data) by visiting a preselected factory and either weighing actual packing materials or reviewing records of packing weights.  Commerce's methodology does not contemplate using incidental information from sample sales documents to verify factor of production data.  The Court finds nothing on the record to suggest that Commerce abused its discretion in this regard.

TMC's claim that pallets are distinct from the packing factor of production is also without merit.  Commerce determined in advance that pallets would be verified as a packing factor of production, and expressly notified TMC of this fact prior to verification.  <u>See</u> Verification Agenda Outline for TMC, Def.'s App. at Ex. 3 at 10 (Apr. 9, 2002).  Moreover, since pallets are used to package the merchandise at issue, such a methodology is

reasonable. "When Commerce applies a reasonable standard to verify materials submitted and the verification is supported by such relevant evidence as a reasonable mind might accept, the Court will not impose its own standard, superceding that of Commerce." Hercules, 11 CIT at 726, 673 F. Supp. at 469 (internal quotation omitted).

Accordingly, the Court holds that Commerce's decision to apply AFA to pallets is supported by substantial evidence and otherwise in accordance with law.

**C.    Commerce's Application of Adverse Facts Available in Calculating Huarong's Labor Rate Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

Huarong argues that Commerce improperly resorted to AFA in calculating its labor rate because Commerce did not demonstrate that Huarong failed to act to the best of its ability during the review. Pls.' Br. at 18. Huarong claims that it complied with Commerce's requests for information, and attributes the disparities observed during verification to errors on the part of Commerce in using the methodology supplied by Huarong to calculate labor production figures. Id. at 20. Specifically, Huarong contends that Commerce should have divided certain production figures by the number of team members. Id. at 25. In addition, Huarong asserts that Commerce did not provide it with an adequate opportunity to correct deficiencies in its submissions. See id. at 26.

Commerce contends that Huarong did not cooperate to the best of its ability in providing information regarding labor production rates. Def.'s Br. at 13-14. According to Commerce, Huarong's labor production computations proved incorrect, despite supplemental requests for information, and did not survive verification. Id. at 19. In addition, Huarong deemed erroneous and subsequently retracted the explanation for the discrepancy that it originally provided to Commerce. Id. at 22. Huarong ultimately attributed the discrepancy to Commerce's faulty application of the provided methodology, and suggested a modification in the calculations. Id. at 20. Commerce contends that Huarong's belated effort at correction is improper, and further notes that the labor production rates proved inaccurate even using Huarong's post-verification methodology. Id. at 19-20.

The Court first examines whether Huarong, through its questionnaire responses, "create[d] an accurate record and provide[d] Commerce with the information requested[.]" Reiner Brach GmbH & Co. KG v. United States, 26 CIT __, __, 206 F. Supp. 2d 1323, 1333 (2002). Huarong's initial response to Commerce's request for information was inadequate, and Commerce provided Huarong with a supplemental questionnaire to clarify ambiguities in the information. See Huarong's Section D Response to Department's Supplemental Questionnaire, Def.'s App. at Ex. 2

(Jan. 15, 2002). Specifically, Huarong was asked to submit worksheets showing the calculation of its reported labor caps. Id. at 12. It responded with a formula multiplying the number of workers by number of hours worked and divided by number of pieces produced. See id. ("Based on years of experience, Huarong has worked out labor ratings which are close to the production records verified by the Department in prior reviews. For heat treatment, as an example, there are six (6) workers in one (1) shift, one (1) skilled and five (5) unskilled. Each shift processes 3430 pieces each work day, which is eight (8) hours."). The methodology set forth in Huarong's supplemental questionnaire response makes no mention of team production or division by number of team members. Thus, based on the information in the supplemental questionnaire response for the tenth review, Commerce did not have notice or reason to believe that it should divide labor figures by number of team members.

Huarong counters that Commerce verified its labor production figures in the ninth review, and therefore should have known to divide certain production figures by number of team members. Pls.' Br. at 25. Huarong, however, did not reference ninth review methodology in its responses to Commerce's questionnaires, and did not alert Commerce prior to verification that the calculations should include division by team members. In addition, as Commerce notes, it need only rely on information

provided in a given review to arrive at its decision.  See Cinsa,
S.A. de C.V. v. United States, 21 CIT 341, 349, 966 F. Supp.
1230, 1238 (1997) (observing that each administrative review is a
separate exercise of administrative procedure opening the
possibility of different conclusions based on different facts
accumulated).  Commerce indicated in the Preliminary Results that
it intended to rely exclusively on the formula provided by
Huarong in the current review, noting that because past
computations produced discrepancies and were not verified, it
would not blindly incorporate past methods into the present
calculations.  See Heavy Forged Hand Tools, Finished or
Unfinished, With or Without Handles, from the People's Republic
of China, Preliminary Results and Preliminary Partial Rescission
of Antidumping Duty Administrative Reviews, Notice of Intent Not
To Revoke in Part and Extension of Final Results of Reviews, 67
Fed. Reg. 10123, 10126 (Mar. 6, 2002) ("Preliminary Results").
Thus, the Court finds that Commerce did not err in failing to
divide certain production figures by number of team members.

Commerce subsequently conducted verification at Huarong's
headquarters from May 27 through May 31, 2002.  See Verification
Report of Huarong, Def.'s App. at Ex. 8 (July 24, 2002).  At
verification, Commerce was unable to re-create or explain the
method by which Huarong arrived at its labor production figures.
Issues and Decision Memo at Cmt. 18.  Commerce then afforded

Huarong the opportunity to explain the discrepancy in production figures, which company officials attributed to an inflated estimate of labor time. See Verification Report of Huarong, Def.'s App. at Ex. 8 at 21-22 (July 24, 2002) ("Company officials explained that the difference between the labor in the production record and their reported figures was due to the fact that the workers did not necessarily work an entire 8 hours per shift. They stated that the use of an 8 hour shift would inflate the labor time for processes where laborers worked fewer hours. For example, after using Huarong's reported formula, it shows that it took [***] and [***] minutes to paint each piece for CONNUMU 5. However, company officials stated that it is unlikely that it took this much labor time to dip a CB or WB into paint. We asked officials to provide the correct amount of time for each shift. However, they could not provide an estimation of the time workers worked on each process for each shift.").

Two months later, Huarong retracted the explanation originally offered by its officials, replacing it with the contention that Commerce "erred . . . when it failed to include the number of workers in the denominator as well as the numerator for some of the[] calculations." Administrative Case Brief of Respondents, Def.'s App. at Ex. 9 at 23 (July 31, 2002). Commerce determined that this post-verification amendment to Huarong's reported methodology was inappropriate. Issues and

Decision Memo at Cmt. 18. Accordingly, Commerce declined to accept the correction and recalculate Huarong's labor production figures. See id.

Agencies generally enjoy broad discretion in fashioning rules of administrative procedure, including the authority to establish and enforce time limits on the submission of data by interested parties. See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 544-45 (1978). In accordance with this principle, Commerce has promulgated regulations setting forth deadlines for submitting factual information. Specifically, 19 C.F.R. § 351.301(b)(2) states that "factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed[.]" 19 C.F.R. § 351.301(b)(2). Moreover, 19 U.S.C. § 1677m(d) provides that "[i]f [a] person submits further information in response to [a] deficiency and . . . such response is not submitted within the applicable time limits, then [Commerce] may . . . disregard all or part of the original and subsequent responses." 19 U.S.C. § 1677m(d). Both the statute and the regulation underscore the breadth of Commerce's discretion in fashioning the temporal parameters of administrative proceedings, and force parties to submit information within a specified time frame in the interests of fairness and efficiency. See Gulf

States Tube Div. of Quanex Corp. v. United States, 21 CIT 1013, 1040, 981 F. Supp. 630, 653 (1997) ("Commerce's policy of setting time limits on the submission of factual information is reasonable because Commerce clearly cannot complete its work unless it is able at some point to 'freeze' the record and make calculations and findings based on that fixed and certain body of information.") (internal quotation omitted).

The correction in this case was submitted two months after verification and approximately six weeks before Commerce issued the Final Results. As such, the correction was tendered at the last minute, and its acceptance or rejection was well within Commerce's discretion. See 19 U.S.C. § 1677m(d). Commerce did not abuse its discretion by disregarding Huarong's correction and declining to modify its calculations after so much time had elapsed since verification. Id.

Huarong suggests that the errors in its data were obvious and that Commerce should have alerted company officials of the incorrect calculations immediately. See Pls.' Reply Br. at 17-19. Huarong implies that it could have cooperated in a better and more timely fashion had Commerce informed it of readily observable and remediable errors in its data. See id. Commerce, however, is under no obligation to request or accept substantial new factual information from a respondent after discovering that a response cannot be corroborated during verification. See

Reiner Brach, 26 CIT at __, 206 F. Supp. 2d at 1334; Bergerac,

N.C. v. United States, 24 CIT 525, 532, 102 F. Supp. 2d 497, 503-

04 (2000).  Verification is intended to test the accuracy of data

already submitted, rather than to provide a respondent with an

opportunity to submit a new response.  See Acciai Speciali Terni

S.P.A. v. United States, 25 CIT 245, 260-61, 142 F. Supp. 2d 969,

986 (2001) (citing Certain Cut-to-Length Carbon Steel Plate from

Sweden, 62 Fed. Reg. 18396, 18401 (Apr. 15, 1997)); see also

Verification Agenda Outline for Huarong, Def.'s App. at Ex. 4 at

2 (Apr. 9, 2002) ("[V]erification is not intended to be an

opportunity for submitting new factual information.  New

information will be accepted at verification only when i) the

need for that information was not previously evident, ii) the

information makes minor corrections to the information already on

the record, or iii) the information corroborates, supports, or

clarifies information already on the record.").  While Commerce

is required to allow respondents to correct clerical errors

discovered late in the administrative process, clerical errors

are distinguished from substantive errors and do not encompass

methodological modifications.[4]  See Torrington Co. v. United

States, 22 CIT 136, 137 (1998).[5]

_____

[4] Clerical errors result from inaccurate copying or
duplication, or other similar unintentional errors.  See World
Finer Foods, Inc. v. United States, 24 CIT 541, 549-50 (2000).

[5] See also Maui Pineapple Co. v. United States, 27 CIT __,
__, 264 F. Supp. 2d 1244, 1261 (2003) (citing Certain Fresh Cut

The errors in Huarong's formula were neither self-evident nor the result of a clerical mistake.  Rather, the errors were substantive in nature, and could be corrected only by modifying Huarong's original methodology.  Commerce therefore was not required to alert Huarong of the errors or to accept substantive corrections post-verification.

Once Commerce identifies a discrepancy in the data submitted by a respondent, it must also find that the respondent failed to cooperate to the best of its ability for AFA to be warranted. See 19 U.S.C. § 1677e(b); see also Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  Commerce is not required to show intentional noncooperation to apply AFA; it need only demonstrate that the respondent did not put forth its maximum effort possible.  See Nippon Steel, 337 F.3d at 1382-83 ("The ordinary meaning of 'best' means 'one's maximum effort,' as in 'do your best.'  . . .  While intentional conduct, such as

_____

Flowers From Colombia, 61 Fed. Reg. 42833, 42834 (Aug. 19, 1996), where Commerce stated that it will "accept corrections of clerical errors under the following conditions: (1) The error in question must be demonstrated to be a clerical error, not a methodological error, an error in judgment, or a substantive error; (2) [Commerce] must be satisfied that the corrective documentation provided in support of the clerical error allegation is reliable; (3) the respondent must have availed itself of the earliest reasonable opportunity to correct the error; (4) the clerical error allegation, and any corrective documentation, must be submitted to [Commerce] no later than the due date for the respondent's administrative case brief; (5) the clerical error must not entail a substantial revision of the responses; and (6) the respondent's corrective documentation must not contradict information previously determined to be accurate at verification").

deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element."). Although the standard does not demand perfection, it censures inattentiveness and carelessness. Id. at 1382. To draw an adverse inference, Commerce must show that the party did not behave in the manner of a reasonable and responsible respondent, and that it failed to put forth its maximum effort in investigating and obtaining the requested information. Id.

Commerce properly applied AFA in this case because Huarong had the ability to timely provide accurate and comprehensive labor production data and simply failed to do so. Commerce, in accordance with 19 U.S.C. § 1677m(d), alerted Huarong of deficiencies in its data by issuing a supplemental questionnaire requesting additional information. A reasonable respondent acting to the best of its ability would have ensured that the information set forth in its supplemental questionnaire response was comprehensive. In contrast, the information provided by Huarong in its supplemental questionnaire response was incomplete and failed to mention methodological modifications for certain production processes. A reasonable respondent also would have promptly provided Commerce with a corrected formula upon Commerce's post-verification request. In contrast, Huarong waited two full months to provide Commerce with a revised formula incorporating a substantial methodological modification. In both

of these respects, then, Huarong did not put forth its maximum effort; thus, Commerce's decision to apply AFA is warranted.

In drawing an adverse inference, Commerce must clearly articulate the manner in which a party failed to cooperate to the best of its ability, and why the missing information is significant to the progress of the proceeding. See Borden, Inc. v. United States, 22 CIT 233, 264, 4 F. Supp. 2d 1221, 1246 (1998). Commerce provided an adequate explanation of its decision to apply AFA in this case, citing its reliance on the methodology provided by Huarong, the verification failure, and Huarong's belated effort at correcting the requested data. See Issues and Decision Memo at Cmt. 18.

Accordingly, Commerce's decision to apply AFA in calculating Huarong's labor production rate is supported by substantial evidence and otherwise in accordance with law.

**D.    Because TMC Failed to Apply for a Scope Ruling Regarding Cast Iron Picks, TMC Did Not Exhaust Its Administrative Remedies.**

Commerce decided that TMC failed to cooperate to the best of its ability by neglecting to report its U.S. sales of three cast iron picks. See Issues and Decision Memo at Cmt. 21. Specifically, Commerce determined that cast iron picks fall within the scope of the antidumping duty orders covering heavy forged hand tools, based on both the language of the orders and a 2001 scope ruling at TMC's behest with regard to Pulaski axes,

which excluded production method from scope determinations.  See
Final Scope Ruling – Antidumping Duty Orders on Heavy Forged Hand
Tools, Finished or Unfinished, With or Without Handles, from the
People's Republic of China – Request by Tianjin Machinery I/E
Corp. for a Ruling on Pulaski Tools, Public Appendix to Motion of
Plaintiffs Tianjin Machinery Import & Export Corp. and Shandong
Huarong General Group Corp. for Judgment on the Agency Record
("Pls.' Pub. App.") at Ex. 14 at 7 (Mar. 8, 2001) ("Pulaski Tools
Final Scope Ruling").  As a result, Commerce applied AFA to
derive the margin for TMC's unreported cast iron pick sales.
Issues and Decision Memo at Cmt. 21.  TMC counters that Commerce
erred in applying AFA because the antidumping duty orders discuss
forging as an exclusive, rather than illustrative, production
method.  See Pls.' Reply Br. at 21.

Under 19 C.F.R. § 351.225(b), a determination regarding the
scope of an antidumping duty order can be initiated by Commerce
or, under 19 C.F.R. § 351.225(c)(1), by the application of an
interested party.  Thus, if a question arises as to whether
certain merchandise is encompassed by an antidumping duty order,
an interested party may request that Commerce issue a scope
ruling to clarify the order's application to the merchandise in
question.

In this case, it is unclear whether cast iron picks fall
within the scope of the antidumping duty orders.  The Pulaski

Tools Final Scope Ruling referenced by both parties is ambiguous in its analysis of the antidumping duty orders, and it provides ambivalent guidance regarding the orders' applicability to cast iron picks.  Moreover, given Commerce's exclusion of production method from scope determinations in the Pulaski Tools Final Scope Ruling, TMC should have hesitated to conclude that cast iron picks fall outside the scope of the antidumping duty orders because they are cast rather than forged.  See Pulaski Tools Final Scope Ruling at 7.  Instead, TMC should have requested a scope determination from Commerce to resolve the issue.  It had an opportunity to do so when Commerce issued the Preliminary Results stating its intent to consider cast iron picks as falling within the purview of the antidumping duty orders.  See Preliminary Results, 67 Fed. Reg. at 10123.  However, TMC never applied for a scope ruling.[6]

Whenever warranted, the Court is obligated to require the exhaustion of administrative remedies before an issue may be properly addressed here.  28 U.S.C. § 2637(d).  "The detailed scope determination procedures that Commerce has provided constitute precisely the kind of administrative remedy that must be exhausted before a party may litigate the validity of the

---

[6] See Oral Argument Tr. at 30 ("[Y]ou're sitting at a verification and they now say you should have asked before for a scope ruling.  And certainly, the issue had – it was not on our radar screen, to use that oft-used phrase.  We – it never occurred to us . . . .").

administrative action."  Sandvik Steel Co. v. United States, 164

F.3d 596, 599-600 (Fed. Cir. 1998).

Accordingly, because TMC failed to exhaust its

administrative remedies, the Court declines to exercise

jurisdiction to address whether Commerce properly applied AFA as

a result of TMC's failure to report its cast iron pick sales.

**E.    Commerce's Decision to Use Indian Import Data for the Period Covering February through December 2000 as the Surrogate Value for the Handles on TMC's Hammers and Axes Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

During the period of review, TMC exported hammers and axes

with wooden and fiberglass handles.  Pls.' Br. at 32.  In

accordance with 19 U.S.C. § 1677b(c)(1), Commerce used Indian

import data for the period covering February through December

2000 as the surrogate value for the handles.[7]  Id. at 33; Def.'s

Br. at 5.  However, Commerce previously determined in a new

---

[7] 19 U.S.C. § 1677b(c)(1) provides:

If--
    (A) the subject merchandise is exported from a
    nonmarket economy country, and
    (B) [Commerce] finds that available information
    does not permit the normal value of the subject
    merchandise to be determined . . . ,
    [Commerce] shall determine the normal value of the
    subject merchandise on the basis of the value of
    the factors of production utilized in producing
    the merchandise . . . .  [T]he valuation of the
    factors of production shall be based on the best
    available information regarding the values of such
    factors in a market economy country or countries
    considered to be appropriate by [Commerce].

19 U.S.C. § 1677b(c)(1).

shipper review for heavy forged hand tools that the same Indian import data for the period covering February through July 2000 was aberrational.  See Heavy Forged Hand Tools From the People's Republic of China: Final Results of New Shipper Administrative Review, 66 Fed. Reg. 54503 (Oct. 29, 2001).

TMC asserts that Commerce should have also rejected as aberrational the February through July 2000 Indian import data used to value the handles on TMC's hammers and axes.  Pls.' Br. at 34.  At a minimum, TMC contends that Commerce should have explained how it determined that this data was aberrational in the new shipper review, but not in the present review.  Id. at 33-34.  TMC further claims that Commerce failed to evaluate the Indian data against the U.S. benchmark, and that had it done so, it would have realized the Indian data was aberrational.  Id. at 32-33.  TMC also points to Commerce's obligation under 19 U.S.C. § 1677b(c)(1) to select the "best available information" when valuing factors of production, arguing that Commerce did not show how the Indian import data, rather than Indonesian import data, was in fact the best available information.  See Pls.' Reply Br. at 10-11.

The Court readily disposes of TMC's first line of argument by applying the doctrine of exhaustion of administrative remedies.  As noted above, "[t]he doctrine . . . provides that no one is entitled to judicial relief for a supposed or threatened

injury until the prescribed administrative remedy has been exhausted." Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998) (quoting McKart v. United States, 395 U.S. 185, 193 (1969)) (internal quotation omitted). The exhaustion doctrine is "particularly pertinent" where, as here, "the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise." McKart, 395 U.S. at 194.

TMC did not raise its contention regarding differential treatment of the February through July 2000 Indian import data in its administrative case brief. See Administrative Case Brief of Respondents, Def.'s App. at Ex. 9 at 13-17 (July 31, 2002). Had TMC identified this issue during the administrative review, Commerce could have addressed it in the Issues and Decision Memo. By not raising its "argument with reasonable clarity and avail[ing Commerce] with an opportunity to address it[,]" Timken Co. v. United States, 25 CIT 939, 958, 166 F. Supp. 2d 608, 628 (2001), TMC failed to exhaust its administrative remedies. Therefore, the Court declines to exercise jurisdiction over this issue.

The Court turns next to TMC's claim that Commerce failed to evaluate the Indian data against the U.S. benchmark. Contrary to TMC's contention, Commerce did make such a comparison. Indeed,

Commerce considered but ultimately rejected Indian import data for January 2001, explaining that "[t]he Department has excluded from the Indian import data the month of January 2001, which has a monthly value that is high enough in relation to the U.S. benchmark and the rest of the Indian data to be considered aberrational." Issues and Decision Memo at Cmt. 7 (emphasis added). Accordingly, the Court finds TMC's assertion to be unfounded.

TMC's argument that Commerce did not show how the Indian import data, rather than Indonesian import data, was the "best available information" is also unavailing. Commerce values the factors of production in a nonmarket economy country "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." 19 U.S.C. § 1677b(c)(1). "While the statute does not define 'best available information,' it grants to Commerce broad discretion to determine the best available information in a reasonable manner on a case-by-case basis." Anshan Iron & Steel Co. v. United States, 27 CIT __, __, Slip Op. 03-83 at 7 (July 16, 2003) (quoting Timken, 25 CIT at 944, 166 F. Supp. 2d at 616) (internal quotation omitted). In fact, "Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was a reasonable way." Coalition for

the Pres. of Am. Brake Drum & Rotor Aftermarket Manufacturers v. United States, 23 CIT 88, 118, 44 F. Supp. 2d 229, 258 (1999).

The record shows that Commerce's decision to use Indian data was well within Commerce's broad discretion. Commerce determined that the average unit value of 289.06 rupees per kilogram (US $6.38 per kilogram) for Indian imports during the eleven-month period was sufficiently viable to be used as a surrogate value. Response of Defendant-Intervenor to Motion by Plaintiffs for Judgment on the Agency Record ("Def.-Intvr.'s Br.") at 25; see also Pls.' Br. at 34; Def.'s Br. at 40. While the Indian value was higher than the 2000 benchmark Indonesian unit value proffered by TMC, the Indian value was substantially lower than the 1999 Indonesian unit price of $11.168 per kilogram. Def.-Intvr.'s Br. at 25. Given the fluctuations in market prices and the wide variations in benchmark prices, the Court finds that the Indian data was a reasonable and appropriate surrogate value.

Accordingly, Commerce's use of Indian import data for the period covering February through December 2000 as the surrogate value for handles is supported by substantial evidence and otherwise in accordance with law.

## F.   Commerce's Fifteen-Day Liquidation Policy Is Not in Accordance with Law.

Shortly before issuing the Final Results, Commerce posted a notice on its website announcing its implementation of a new liquidation policy. The notice states that Commerce intends to

issue liquidation instructions to Customs "within 15 days of publication of the final results of review in the *Federal Register* or any amendments thereto." Announcement Concerning Issuance of Liquidation Instructions Reflecting Results of Administrative Reviews, Pls.' Pub. App. at Ex. 13 (Aug. 9, 2002).

Plaintiffs challenge this new liquidation policy on the grounds that it conflicts with the sixty-day period set forth in USCIT Rule 3(a)(2) for perfecting an appeal. Pls.' Br. at 35. Plaintiffs further contend that the new policy will result in a flood of preliminary injunction motions before the Court by parties seeking to stay liquidation and preserve the Court's jurisdiction. See id.

Commerce posits that the new policy is in accordance with law because nothing in Rule 3(a)(2) prohibits a party from filing its summons and complaint together within fifteen days after publication of the final results. Def.'s Br. at 42-43. Commerce also asserts that in light of the Federal Circuit's determination in International Trading Co. v. United States that entries not liquidated within six months of the publication of final results are deemed liquidated at the cash deposit rate, it would be administratively unwise for Commerce to wait sixty days before sending liquidation instructions to Customs. Id. at 43.

Rule 3(a)(2) implements the statutory directive of 19 U.S.C. § 1516a(2)(A) that an interested party may challenge an

administrative determination by filing a summons within thirty days of the date of publication of the final results in the Federal Register, and by subsequently filing a complaint within thirty days thereafter.  19 U.S.C. § 1516a(2)(A).  On its face, then, § 1516a(2)(A) allows a plaintiff to <u>wait</u> thirty days before filing its summons, and to <u>wait</u> an additional thirty days before filing its complaint.  The fact that a party <u>could</u> file both its summons and complaint within fifteen days is immaterial.  Because Commerce's fifteen-day liquidation policy directly contravenes the time frame established by § 1516a(2)(A) for filing a summons and a complaint, the Court finds that Commerce's new policy is not in accordance with law.[8]

Moreover, the Court is concerned that Commerce's new policy will compel parties, in every instance, to seek a preliminary injunction within fifteen days to prevent liquidation and preserve the Court's jurisdiction, regardless of whether the party ultimately decides to challenge any aspects of the final

---

[8] Commerce argues that Plaintiffs do not have standing because they waited eighteen days (instead of fifteen) to file their summons and complaint. <u>See</u> Def.'s Br. at 45.  The Court disagrees.  19 U.S.C. § 1516a(2)(A) permits parties to wait thirty days before filing their summons, and an additional thirty days before filing their complaint.  However, because of Commerce's new liquidation policy, Plaintiffs felt compelled to file their summons and complaint within eighteen days.  Plaintiffs were injured to the extent that Commerce's new policy required them to file their summons and complaint prematurely; the fact that Plaintiffs waited for eighteen days instead of fifteen is beside the point.  Thus, Plaintiffs do have standing to challenge Commerce's new liquidation policy.

determination.  As a result, in addition to imposing financial burdens on litigants in the form of increased attorney's fees and court costs, the policy will also impose a substantial burden on the Court by inundating it with preliminary injunction motions.

Although Commerce contends that it would be administratively unwise to wait sixty days before issuing liquidation instructions, the rationale offered by Commerce at oral argument to support this assertion is wholly insufficient.  Commerce's entire argument is as follows:

> [I]t does take a while for Commerce to issue the instructions, for those instructions to make it to the ports at Customs, and then for the individual Port Directors to actually liquidate those entries.  It's a time-consuming process that takes double-checking and double-checking to make sure that there are no inadvertent liquidations.

Oral Argument Tr. at 72.  Commerce's argument is conveniently vague and entirely fails to address exactly how "time-consuming" the liquidation process is.  As a result, the Court finds that Commerce has not adequately explained how it would be administratively unwise to wait sixty days, instead of fifteen, before issuing liquidation instructions.

Accordingly, the Court holds that Commerce's fifteen-day liquidation policy is not in accordance with law.

### III.  <u>CONCLUSION</u>

For the aforementioned reasons, the Court sustains the <u>Final Results</u>, but finds that Commerce's fifteen-day liquidation policy

is not in accordance with law.  Judgment will be entered

accordingly.


                                    /s/ Richard W. Goldberg
                                    **Richard W. Goldberg**
                                    **Senior Judge**

**Date:      October 4, 2004**
            **New York, New York**